In the Matter of the Estate of WILLIAM GASPAR, Deceased. TEADOR GASPAR, Plaintiff and Appellant, *v.* STATE OF MONTANA, Defendant and Appellant, and ATTORNEY GENERAL OF THE UNITED STATES, Defendant and Respondent.

No. 9306.

Submitted May 8, 1954.   Decided October 21, 1954.

275 Pac. (2d) 656.

Mr. Chief Justice Adair and Mr. Justice Bottomly not participating.

Mr. Ralph J. Anderson, Helena, for Teador Gaspar.

Mr. Arnold H. Olsen, Atty. Gen., Mr. J. J. McCaffery, Jr., Sp. Asst. Gen., Butte, for State of Montana.

Mr. Valentine C. Hammack, Sp. Asst. to U. S. Atty. Gen., for respondent.

Mr. Anderson, Mr. McCaffery and Mr. Hammack argued orally.

MR. JUSTICE FREEBOURN:

This is an appeal by the plaintiff, Teador Gaspar, and the defendant, State of Montana, from a decree determining heirship made and entered in the district court of the fourteentnh judicial district of the State of Montana, in and for the County of Meagher, on the 27th day of January 1953, by the Honorable F. V. Watts, district judge presiding.

In such degree determining heirship the district court in part found:

"That William Gaspar died intestate on the 13th day of August, 1940; that at the time of his death he was a resident of Meagher County, Montana; that he left estate therein consisting of personal property.

"That he left surviving as his only heirs at law the persons whose names and relationship to said deceased are as follows, to-wit: Teador Gaspar, a brother of deceased; John Gaspar, a brother of deceased; and (Mrs.) Elena Gaspar Cornea, a sister of the deceased.

"That the said Teador (Tony) Gaspar is a resident of Meagher County, Montana.

"That John Gaspar and (Mrs.) Elena Gaspar Cornea during all times mentioned herein have been, and each of them was, a subject, citizen and resident of Rumania, residing in the town of Chisindia, Rumania * * *

"That upon the death of William Gaspar the estate of William

Gaspar descended to his heirs at law, subject to administration in the following proportions, to-wit:

"That said Teador (Tony) Gaspar is the owner of an undivided one-third thereof, now vested in him;

"Upon said death an undivided one-third thereof vested in John Gaspar, the testator's brother, a resident and citizen of Rumania;

"Upon said death an undivided one-third thereof vested in (Mrs.) Elena Gaspar Cornea, a resident and citizen of Rumania."

When William Gaspar died on August 13, 1940, leaving property without disposing of it by will, such property immediately passed to and vested in his heirs, Teador Gaspar, a brother, John Gaspar, a brother, and Mrs. Elena Gaspar Cornea, a sister. R. C. M. 1947, sec. 91-402, sec. 7072, R. C. M. 1921, provides: "Intestate estate—to whom passes. The property, both real and personal, of one who dies without disposing of it by will, passes to the heirs of the intestate, subject to the control of the district court, and to the possession of any administrator appointed by that court for the purposes of administration."

"The law is well settled in this state that where one dies intestate, title to his property, real and personal, vests immediately in his heirs. Section 7072, Rev. Codes; see In re Estate of Clark, [105 Mont. 401], 74 Pac. (2d) 401 [114 A. L. R. 496], * * * and cases therein cited. Such transfer is by operation of law, which by statute is given the same force and effect as a transfer in writing." Gaines v. Van Demark, 106 Mont. 1, 74 Pac. (2d), 454, 456.

"* * * there can be no doubt that the rights of heirs vest under our statutes immediately upon the death of the intestate. Section 7072, Revised Codes; In re Williams' Estate, 55 Mont. 63, 173 Pac. 790, 1 A. L. R. 1639; State ex rel. Wilson v. Musberger, 114 Mont. 175, 133 Pac. (2d) 586; In the Matter of the Estate of Nossen, [118 Mont. 40], 162 Pac. (2d) 216, * * *." In re Giebler's Estate, 118 Mont. 44, 162 Pac. (2d) 368, 370. See also Hoppin v. Long, 74 Mont. 558, 241 Pac. 636; Lamont v. Vinger, 61 Mont.

530, 202 Pac. 769; Murch v. Fellows, 118 Mont. 461, 167 Pac. (2d) 842.

In In re Nossen's Estate, cited supra [118 Mont. 40, 162 Pac. (2d) 217], this court said: "It is well settled that rights vest under our statutes immediately upon the death of a testator (section 7040, Rev. Codes [1935, R. C. M. 1947, sec. 91-225]), Gelsthorpe v. Furnell, 20 Mont. 299, 51 Pac. 267, 39 L. R. A. 170; In re Clark's Estate, 105 Mont. 401, 74 Pac. (2d) 401, 114 A. L. R. 496; Montgomery v. First Nat. Bank of Dillon, 114 Mont. 395, 136 Pac. (2d) 760, or upon the death of an intestate (section 7072, Rev. Codes), In re Williams' Estate, 55 Mont. 63, 173 Pac. 790, 1 A. L. R. 1639; State ex rel. Wilson v. Musberger, 114 Mont. 175, 133 Pac. (2d) 586."

Since the heirs, Teador Gaspar, John Gaspar, and Mrs. Elena Gaspar Cornea were brothers and sister of the intestate William Gaspar, the distributive share of each had to be fixed by the district court at one-third each, "equal shares," under R. C. M. 1947, sec. 91-403, subd. 3. Such distributive shares had to be fixed so that in case of an escheatment, Article XI, sec. 2, of the Montana Constitution could be satisfied, it providing that, "The public school fund of the state shall consist of * * * all estates, or distributive shares of estates that may escheat to the state * * *." See Bottomly v. Meagher County, 114 Mont. 220, 133 Pac. (2d) 770.

Because John Gaspar and Mrs. Elena Gaspar Cornea were not citizens of the United States, but were residents of a foreign country, Rumania, they could not receive their respective one-third shares in the estate left by William Gaspar, deceased, until they met the reuqirements of Chapter 104, Laws of 1939, sec. 2 (see R. C. M. 1947, sec. 91-520). This section provided on August 13, 1940, that: "No person *shall receive* money or property, save and except mining property, as provided in section 25, Article III, of the Constitution of the state of Montana, as an heir, devisee and/or legatee of a deceased person leaving an estate or portion thereof in the state of Montana, if such heir, devisee and/or legatee, *at the time of the death of said deceased person,* is not a

citizen of the United States and is a resident of a foreign country at the time of the death of said intestate or testator, unless, reciprocally, the foreign country in question would permit the transfer to an heir, devisee and/or legatee residing in the United States, of property left by a deceased person in said foreign country.'' Emphasis supplied. (Amended by Chapter 31, Laws of 1951.)

In Bottomly v. Meagher County, supra [114 Mont. 220, 113 Pac. (2d) 776], this court said: ''As for alien heirs, since their rights depend upon the existence of the recoprical permission required of their country by section 2 of Chapter 104, the burden is clearly upon them to prove its existence. In re Braun's Estate, 161 Or. 503, 90 Pac. (2d) 484.''

In In re Braun's Estate, supra [161 Or. 503, 90 Pac. (2d) 488], the Oregon Supreme Court said: ''Fritz Braun died July 26, 1937, and the record fails to disclose any evidence to the effect that at the time of his death citizens of the United States had a right to receive payment to them within the United States of moneys originating from estates of persons dying within Germany, of which country the alleged brothers and sisters of Fritz Braun are residents and citizens. It would appear that under the foregoing statute it was incumbent upon such brothers and sisters to prove that they were not precluded from receiving personal property as heirs of the decedent.''

The burden of proving such reciprocity falls upon the foreign heirs because they, being in the foreign country, are in a better position to prove the laws thereof than any other party to the heirship proceedings. The fact that such burden rests upon the foreign heirs does not mean, however, that no other party to the heirship proceedings may make such proof, where it is to their interests to do so.

Under R. C. M. 1947, sec. 91-3801, ''Proceedings to determine heirship'', the district court orders that notice of the same be given ''all persons interested in said estate, * * * to appear and exhibit * * * their respective claims of heirship, ownership, or interest in said estate * * * [and] the court or judge thereupon ac-

quire jurisdiction to ascertain and determine the heirship, ownership, and interest of all parties in and to the property of said deceased * * *.''

Such reprocity being shown and such foreign heirs being ▆ residents of Rumania, their shares in the estate of said deceased, by operation of law, passed to the attorney general of the United States, successor to the rights of the alien property custodian, because Rumania was a ''designated enemy country.'' See Trading with the Enemy Act, 50 U. S. C. A. Appendix, secs. 5 and 6, with notes. Both the United States and the State of Montana were interested in securing the shares of the foreign heirs and both were proper and interested parties in such determination of heirship.

''The Alien Property Custodian's petition thus constitutes an intervention by which he claims the rights of the aliens.'' In re Giebler's Estate, supra. ''* * * the vesting orders have the effect of assignments by operation of law and vest the interest of the named heirs in the Alien Property Custodian.'' In re Rade's Estate, 259 Wis. 169, 47 N. W. (2d) 891, 893.

''The Alien Property Custodian is given full authority to succeed to their [foreign heirs'] interests and to take such action as may be necessary to enforce and protect their rights.'' In re Bevilacqua's Estate, 31 Cal. (2d) 580, 191 Pac. (2d) 752, 755.

The district court, upon the evidence submitted by the attorney ▆ general of the United States, was justified in finding and adjudging, as it did:

''That on August 13, 1940 [the date of death of William Gaspar], there existed between Rumania and the United States and/or the State of Montana a reciprocal right of United States citizens residing in the State of Montana to take a Rumanian estate by inheritance in like manner as a resident and citizen of Rumania.

''That on August 13, 1940, United States citizens, residing in the State of Montana, had the right under Rumanian law as established and administered at that time, to take personal property or the proceeds thereof derived from estates of persons dy-

ing in Rumania by descent and inheritance and the right to receive money and property, or the proceeds thereof, from such estates; that the laws of Rumania permitted the transfer to an heir, devisee and/or legatee residing in the United States of money and property or the proceeds thereof left by a deceased person in Rumania, in the ordinary course of business exchange.

"That at said time there existed reciprocity in law and in fact between Rumania and the United States and/or the State of Montana covering United States citizens residing in the State of Montana and involving descent and inheritance of, and the receipt of money and property, or the proceeds thereof, within the contemplation of Chapter 104, Session Laws of Montana, 1939."

The district court was further justified in finding and adjudging from the evidence: ·

"That on October 10, 1942, Leo T. Crowley, as Alien Property Custodian of the United States then in office, issued Vesting Order No. 226, vesting in himself all right, title, and claim of any kind or nature whatsoever in the Estate of William Gaspar, deceased, of John Gaspar and (Mrs.) Elena Gaspar Cornea for the use and benefit of the United States. * * *

"That pursuant to Vesting Order No. 226, the Attorney General of the United States succeeded to all right, title, and interest of the said John Gaspar and of the said (Mrs.) Elena Gaspar Cornea, in the estate of William Gaspar, deceased."

It appears from the evidence that on October 15, 1946, the President of the United States, by executive order 9788, 50 U. S. C. A. Appendix, sec. 6 note, directed that:

"1. The Office of Alien Property Custodian in the Office for Emergency Management of the Executive Office of the President, established by Executive Order No. 9095 of March 11, 1942, is hereby terminated; and all authority, rights, privileges, powers, duties, and functions vested in such Office or in the Alien Property Custodian or transferred or delegated thereto are hereby vested in or transferred or delegated to the Attorney General, as the case may be, and shall be administered by him or un-

der his direction and control by such officers and agencies of the Department of Justice as he may designate.

"2. All property or interest vested in or transferred to the Alien Property Custodian or seized by him, and all proceeds thereof, which are held or administered by him on the effective date of this order are hereby transferred to the Attorney General."

In proving such reciprocity the United States relied on the testimony of two witnesses, Dr. David Avram and Dr. John Fischer, and on a number of exhibits, including translated copies of the laws of inheritance of Hungarian laws which were in effect "in the town of Chisindia, County of Arad, in Rumania [where the foreign heirs resided], during the month of August, 1940," a national commentary or treatise of Dr. Tihamer Fabinyi which gave "the full text of the decisions of the Supreme Court;" a portion of a commentary or treatise "on the laws of inheritance * * * by Balint Kolossvary" resorted to by the courts and lawyers to interpret the law in Hungary; a portion of a commentary or treatise of Dr. Istvan Szaszy relating to the laws of Hungary "and particularly to the inheritance laws;" and sections of the Rumanian constitution and collection of statutes and regulations of January 1, 1938, in force and effect in Rumania in 1940. Fischer, called as an expert on Hungarian law, living in Washington, D. C., since November, 1948, testified: That he left Hungary in December 1947; that he was a "practicing attorney and lawyer, member of the bar in Hungary," having "acquired doctor in law degree in 1932;" that he practiced law in Kisvarda; that he moved to Budapest in 1945 and "from the very beginning of 1946 practiced law in Budapest as a member of this bar until 1947," when he left Hungary; that his "practice embraced practically every field of law including criminal;" and including inheritance tax cases; that he was familiar "with the town of Chisindia in the County of Arad [where the foreign heirs resided] * * * * which belonged formerly to Hungary" and at the present time is in Rumania; "that after the territory ceded to Rumania, the Hungarian private law, and so the Hungarian law of

inheritance still continued to remain in force until 1943 * * * the Hungarian laws of inheritance are written customary laws."

As an expert on Hungarian law, Fischer testified: "I state very definitely that a citizen of the United States, or resident or citizen of the State of Montana, had the same right to inherit in Hungary, both on the basis of—both real and personal property, under the same terms without any conditions as the citizens and residents of Hungary. * * * It means under the terms of reciprocity, aliens have the same right to inherit in Hungary as Hungarian citizens and Hungarian residents. * * * reciprocity was presumed and the burden to prove the lack of reciprocity was on him who questioned or denied the reciprocity." He testified, "A citizen of the United States and Montana [was] entitled [on August 13, 1940, under Hungarian laws] to succeed to an estate located there under the same terms and conditions as a resident and national of Hungary and pursuant to Hungarian law."

As to the witness Avram, a Rumanian lawyer in 1940, the record shows: "Mr. Hammock: May the qualifications of Dr. Avram as an expert on Rumanian law be stipulated to? Mr. McCaffery: As far as the State of Montana is concerned they may be, Mr. Anderson, I guess so."

Avram testified: "Chisindia, the village in the County of Arad, was a part of Rumania in 1940, as well as today, and it is a part of Rumania today. * * * The Rumanian laws of inheritance, specifically the civil code containing the Rumanian laws of inheritance, were not in force in the County of Arad back in 1940. * * * The old laws of Hungary insofar as consistent with the Rumanian constitution [were in effect in Chisindia] until 1943."

Avram further testified; "* * * a citizen of Montana has the legal right, under Rumanian constitutional provisions and the law, to inherit an estate located in Rumania upon the same terms and conditions as a citizen and resident of Rumania. * * * The legal situation is the same today [November 6, 1951] as it was back in 1940 * * *. There is still a legal right for an alien heir in-

terested in a Rumanian estate to receive his share and to have it transferred to this country * * *''.

Since December, 1945, when Avram came to this country he maintained his study of Rumanian laws, as enacted after his departure from Rumania and he is ''currently acting as consultant on the law of Rumania and appearing in American courts with respect to questions involving the law of Rumania.''

R. C. M. 1947, sec. 93-1001-14, sec. 10552, R. C. M. 1921, provides: ''Other evidence of laws of other states. The oral testimony of witnesses skilled therein is admissible as evidence of the unwritten law of a sister state or foreign country, as are also printed and published books of reports of decisions of the courts of such state or country, or proved to be commonly admitted in such courts.'' See Ridpath v. Heller, 46 Mont. 586, 129 Pac. 1054.

''Unwritten law is the law not promulgated and recorded, as mentioned in section 93-1001-8 [sec. 10546, R. C. M. 1935], but which is nevertheless, observed and administered in the courts of the country. It has no certain repository, but is collected from the reports of the decisions of the courts and treatises of learned men.'' R. C. M. 1947, sec. 93-1001-11.

In In re Nielsen's Estate, 118 Mont. 304, 165 Pac. (2d) 792, 795, this court said:

''In other words, it [written law] need not be expressly evidenced in decisions but may be 'collected', 'gathered', or, as the witness said, 'implied' from the decisions. It follows that the existence of decisions permitting and the absence of decisions denying the right of inheritance by non-residents of Denmark is evidence of the law of that country in the absence of written statutory law, even though the exact principle is not shown to have been expressly declared in so many words.

''In contrast with the provisions of section 10549 [R. C. M. 1935, R. C. M. 1947, sec. 93-1001-11], section 10552 [R. C. M. 1935, R. C. M. 1947, sec. 93-1001-14] fails to mention 'treatises of learned men' as proof of the unwritten law of a foreign country; it provides: 'The oral testimony of witnesses skilled therein is

admissible as evidence of the unwritten law of a sister state or foreign country, as are also printed and published books of reports of decisions of the courts of such state or country, or proved to be commonly admitted in such courts.'

"Since the latter section merely specifies that certain evidence is admissible without specifying the inadmissibility of the 'treatises of learned men,' which section 10549 [supra] states as one of the sources from which unwritten law is collected, we conclude that the two sections are to be read together, and that the exhibits and the deponent's testimony concerning them were admissible. * * *

"There was ample competent and uncontradicted evidence to sustain the court's findings and conclusions as to the reciprocal right of American citizens to inherit property under the law of Denmark, and no evidence appears in the record to the contrary."

Contention is made here that the proof required to show reciprocity under Chapter 104, Laws of 1939, should be enlarged so as to meet the requirements of such 1939 law, as amended by Chapter 31, Laws of 1951. Such 1951 amendment has the following subsection, which is not a part of the 1939 law: "2. In order to prove reciprocity the alien heir * * * must establish by competent evidence produced at a hearing to determine heirship; (a) that such foreign country recognizes the right of United States citizens to inherit property left by a deceased person in such foreign country; (b) that such foreign country places no restrictions upon the movement of money or property out of such foreign country to an heir, devisee and/or legatee residing in the United States."

In Butte & Superior Mining Co. v. McIntyre, 71 Mont. 254, 229 Pac. 730, 733, this court said: "'A statute which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions already past, is deemed retroactive. Sturges v. Carter, 114 U. S. 511, 5 S. Ct. 1014, 29 L. Ed. 240; The Society for Propagating the Gospel v. Wheeler, Fed. Cas. No.

13,156, 2 Gall. 139; City of New Orleans v. New Orleans & C. Railroad Co., 35 La. Ann. 679; Crane v. Cox, 18 N. M. [377] 379, 157 Pac. 589.''

In In re Nossen's Estate, supra, where Mrs. Nossen had died in 1935, and the shares of heirs, residents of Germany, had been distributed to the alien property custodian, and the attorney general of Montana contended that Chapter 104, Laws of 1939, should govern such distribution, this court said:

''No question is raised as to the Alien Property Custodian's right to receive the shares of enemy alien heirs. The appellant's only contention is that before the vesting order was made the non-resident aliens' interests became the property of the State of Montana, under Chapter 104, Session Laws of 1939. * * *

''By the same decision [Bottomly v. Meagher County, 114 Mont. 220, 133 Pac. (2d) 770] this court held the provisions of section 2 of Chapter 104 valid as to the estate of an intestate who died after its passage and approval. The question here is whether it can have application to the estate of one who died before its passage and approval. * * *

''* * * The rights of the heirs vested in 1935, prior to the passage of Chapter 104 in 1939.

''* * * No citation of authority is necessary to demonstrate the fact that such application of the Act to any interest already vested would violate the constitutional inhibition against the deprivation of property without due process of law. Constitution of Montana, Art. III, section 27.''

For the reasons stated the decree of the district court determining heirship is affirmed.

MR. JUSTICE ANGSTMAN and MR. JUSTICE ANDERSON, concur.

MR. CHIEF JUSTICE ADAIR and MR. JUSTICE BOTTOMLY deeming themselves disqualified, did not hear arguments in the case and took no part in its determination.