In the Matter of the Estate of ANNA HOSOVA, Deceased. BOZENA VINSOVA and ANTONIN HOSA, Petitioners and Appellants, v. THE STATE OF MONTANA, Defendant and Respondent.

No. 10457

Submitted September 10, 1963. Decided November 29, 1963.
Rehearing denied December 16, 1963.

387 P.2d 305.

Charles E. Davidson (argued), Great Falls, Peter A. Schwabe (argued), Portland Ore., for appellants.

Forrest H. Anderson, Atty. Gen., Helena, N. A. Rotering (argued), Butte, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal by Bozena Vinsova and Antonin Hosa, daughter and son and next of kin of Anna Hosova, deceased, from a judgment and decree entered in the estate of Anna Hosova, deceased, by the Honorable R. J. Nelson, Judge of the District Court of the Eighth Judicial District of the State of Montana, in and for the County of Cascade.

Anna Hosova died intestate at Louny, Czechoslovakia, on June 10, 1946, leaving an estate in Cascade County, consisting of an undivided one-half interest in certain farm lands of substantial value.

On January 27, 1960, Bozena Vinsova and Antonin Hosa, residents of Czechoslovakia, by their attorney filed a petition for determination of heirship and for order declaring reciprocity to exist. In this petition it was alleged inter alia, that reciprocity of inheritance rights between the United States and Czechoslovakia existed at the time of the death of Anna Hosova and still exists as required by R.C.M.1947, section 91-520, and prayed that their rights as heirs of the decedent be determined by the court.

The State of Montana, on March 22, 1960, filed its answer denying that such reciprocity existed on June 10, 1946, the date of death of the deceased or now exists between the United States and Czechoslovakia and prayed that "the foreign heirs be put upon their proof in establishing heirship and proving reciprocity of inheritance and reciprocity of transfer as required by law."

After due proceedings the matter came on for hearing before the court, sitting without a jury on October 25, 1960. By stipulation of counsel it was agreed that the testimony of expert witnesses and other material evidence on the issue of reciprocity of inheritance would cover not only the date of death of Anna Hosova, that is, June 10, 1946, but also four other cases pending in Montana involving heirs or beneficiaries in Czechoslovakia. The dates of death in these four cases are all later than the date here. However, this appeal concerns only the

date of Anna Hosova's death and only evidence pertaining to that date has been reviewed.

Before going into the merits of this appeal, the court would like to make the following observations. The record in this case is somewhat confused and we are not surprised that the trial judge erred in his findings. Contributing in part to this confusion was the appellants' petition for determination of heirship and for order declaring reciprocity to exist. In their prayer for relief the appellants asked that the "Court further determine that reciprocity of inheritance *exists* (emphasis supplied) and did exist at the time of the death of the deceased between the Republic of Czechoslovakia and the United States of America." As we shall point out later, in this case whether reciprocity exists at the present time is of no import. The main source of the confusion, however, was the attempt on the part of the litigants to present in this trial evidence on the question of reciprocity which pertains to dates after 1946 when entirely different laws were in effect, both here in Montana and in Czechoslovakia.

Appellants' only specification of error is that the lower court erred in finding that reciprocity of inheritance did not exist between the United States and Czechoslovakia on June 10, 1946, the date of the death of Anna Hosova and in ordering the escheat of the distributive shares of her heirs.

It is well-settled that rights vest under our statutes immediately upon the death of a testator, Gelsthorpe v. Furnell, 20 Mont. 299, 51 P. 267; In re Clark's Estate, 105 Mont. 401, 74 P.2d 401, 114 A.L.R. 496; Montgomery v. First National Bank of Dillon, 114 Mont. 395, 136 P.2d 760; or upon the death of an intestate. In re William's Estate, 55 Mont. 63, 173 P. 790, 1 A.L.R. 1639; State ex rel. Wilson v. Musburger, 114 Mont. 175, 133 P.2d 586. Thus, as the rights were settled as of that date, we must examine the evidence in the light of the requirements of the 1946 statute governing reciprocity. In 1946, what is now presently section 91-520, R.C.M.1947, read:

"No person shall receive money or property, save and except mining property, as provided in section 25, Article III, of the Constitution of the State of Montana, as an heir, devisee and/or legatee of a deceased person leaving an estate or portion thereof in the state of Montana, if such heir, devisee and/or legatee, at the time of the death of said deceased person, is not a citizen of the United States and is a resident of a foreign country at the time of the death of said intestate or testator, unless, reciprocally, the foreign country in question would permit the transfer to an heir, devisee and/or legatee residing in the United States, of property left by a deceased person in said foreign country."

In 1953, this section was amended, and now in order to show reciprocity of inheritance it is necessary to prove, in addition to the prior requirements, that the foreign country places no restrictions upon the movement of money or property out of such country to an heir residing in the United States. R.C.M.1947, section 91-520, subd. (2). Thus, it is obvious that because such requirement was added in 1953, it was not an inherent requirement in the 1946 version of the section.

In viewing the evidence we must view it in the light most favorable to the party which prevailed in the lower court. Holland v. Konda, 142 Mont. 536, 385 P.2d 272. We will examine only that evidence which pertains to the date in question in order to find out if there is substantial evidence to support the finding made by the court below.

The appellants first introduced petitioner's exhibit "A," a certificate by the Ambassador of the Republic of Czechoslovakia, which was properly admitted into evidence. See In re Spoya's Estate, 129 Mont. 83, 282 P.2d 452. In it, the Ambassador stated among other things, that Czechoslovakia allows and has always allowed nonresident aliens the right to inherit and take real and personal property from decedents' estates situated in Czechoslovakia upon the same terms and conditions as citizens of that country, unless it could be shown

that the country of which the alien in question is a citizen discriminates against the rights of Czechoslovakian citizens to inherit in that country.

The appellants' first witness was Dr. Alex Bozdech of Prague, Czechoslovakia. He testified that he was educated in Czechoslovakia and that he had practiced law there for many years. At the present time he is employed by a Legal Advice Bureau where he has had experience in handling cases involving persons who died in Czechoslovakia and left heirs in America and also cases where persons died in America and left heirs in Czechoslovakia. He further stated that he had testified as an expert in American courts at other times on the subject of reciprocity of inheritance. On cross-examination he denied that he was employed by the Czechoslovakian government and stated that his salary was paid by the Legal Advice Bureau, which in turn, received its money from the clients it served. On redirect Dr. Bozdech testified that in 1946 the Austrian Civil Code was still in effect and that it provided for reciprocity of inheritance. This provision was contained in Section 33 of the Austrian Imperial Code which Dr. Bozdech translated for the record. It read:

"Aliens in general have the same civic rights and duties as citizens as far as the enjoyment of such rights does not expressly require the qualification of a citizen. Aliens have also to enjoy the same rights as citizens where a doubt arises to prove that the country of which they are citizens treat citizens of this country in the same way as their own citizens as far as a specific right is concerned."

In response to a question by appellants' counsel the witness explained that this section, as it pertained to the rights of an American citizen to inherit, were the same as a Czechoslovakian citizen. He further testified that he was convinced that since 1945 there was "never a difficulty about any American citizen being entitled to the same rights as far as inheritance is concerned."

80

Appellants then offered into evidence a group of 88 decrees of distribution by Czechoslovakian courts in which American heirs or beneficiaries received a share of real or personal property situated in that country. These decrees contained the seal of the court properly authenticated and were in substantial compliance with R.C.M.1947, § 93-1001-19, and hence were properly received into evidence. In re Spoya's Estate, supra. Although most of these decrees pertain to dates other than the one in question, *three of them have dates of death within three months of the date here in question.* In these cases it appears that the Czechoslovakian courts decreed that American devisees and legatees were allowed to share in the Czechoslovakian estates. As was stated in In re Miller's Estate, 104 Cal.App.2d 1, 230 P.2d 667, 676, about decrees of German courts:

"* * * Obviously, then, circumstantial evidence is admissible in this type of case. Actually, how better can the effect and application of the law be proved than by showing what the German probate courts and persons charged with administering property of foreigners did under it?"

Appellants then called Dr. Zelemik Pisk, Third Secretary of the Czechoslokanian Embassy, who is also acting Chief of Consular Section of the Embassy in Washington. Dr. Pisk was born in Czechoslovakia and attended school there until 1952 when he graduated as a Doctor of Laws. The witness testified that in his official position at the Embassy he was concerned with the estates of persons dying in the United States going to heirs in Czechoslovakia as well as estates of persons dying in Czechoslovakia coming to American heirs. He stated that in his capacity as consular official his duty was to protect the interests of Czechoslovakian heirs and that this was the primary purpose of his testimony. He stated that after discussing the matter of reciprocity of inheritance at the Ministry of Foreign Affairs, they could not find a single case in which the Czechoslovakian courts had denied reciprocity. He

stated that although he had not personally handled any cases in 1946, he could say from his personal knowledge that reciprocity of inheritance existed at that time. Finally in summing up, the witness testified: "I may confirm on behalf of my government that our Courts recognize the reciprocity toward the United States of America without any reservations, that means fully." In response to a question by appellants' counsel he stated that this included the date June 10, 1946. On cross examination Dr. Pisk admitted that he did not know of any ·case where funds from a Czechoslovakian estate were transmitted to Montana heirs. However, on re-direct he stated that the fact that there were no Czechoslovakian decrees involving Montana heirs did not mean that they were discriminated against.

The respondent State of Montana called as an expert witness Dr. Alois Rozehnal of New York City. He testified that he was born in Czechoslovakia and that after receiving his Doctor of Laws there, he practiced law from 1932 to 1948 when he was forced to leave by the Communists. At the present, he stated, he was employed by a private organization and was charged with watching the social, economic and legal development of Czechoslovakia. To do this, he stated, he read all pertinent publications published in that country.

According to the witness, from 1946 to 1948, it was not possible to reject the inheritance of agricultural land and ownership of land was bound by the condition that it would be personally tilled by the owner. This, plus the fact that the owner could not readily change jobs and leave the land, made the agricultural land worthless. In response to a question as to whether he thought reciprocity of inheritance existed between the United States and Czechoslovakia, he replied that he did not. On cross examination, the witness was asked this question:

"Q. Give us your definition or of your understanding of the reciprocal rights of inheritance, or what is your under-

standing of reciprocity of inheritance rights? A. My understanding is that the American citizen has the same unrestricted rights to his inheritance in Czechoslovakia as the Czechoslovakian citizen has to his inheritance in the United States, and because they do not have in Czechoslovakia the same rights as the citizens of this state of Montana have here I came to the conclusion that there is no reciprocity between the state of Montana and the state of Czechoslovakia."

This answer by the respondent's witness would seem to indicate that his concept of what constitutes reciprocity of inheritance is somewhat different than the view taken by this court in several cases. His view would seem to require that Czechoslovakia treat aliens from Montana, in inheritance matters, the same way that Montana treats its own citizens. In other words, under his view a Montana citizen, with respect to inheritance matters, could theoretically be treated better than a Czechoslovakian citizen in his own country. This is not the law. A careful reading of the Montana cases indicates that what is required is that the foreign country treat Montana citizens as it treats its own citizens, that is, that it does not discriminate against them. See In re Nielsen's Estate, 118 Mont. 304, 165 P.2d 792; In re Estate of Gaspar, 128 Mont. 383, 275 P.2d 656; In re Estate of Spehar, 140 Mont. 76, 367 P.2d 563. Dr. Rozehnal further testified that the so-called "confiscation laws" of 1945 were, though allegedly aimed at German collaborators, instruments of Communist oppression. He further stated that he was sure that American property was confiscated under these decrees. The witness said that during the period of 1945 to 1948, he was involved in many inheritance cases where some of the heirs resided in America. When asked to name a single case or give the particulars of a single case where an American citizen living in the United States or living elsewhere was discriminated against, the witness could not give one. He then stated that although he never handled a case personally, he knew of cases where attorneys could not

get a permit to transfer money to the United States. In response to a question concerning the 88 decrees of the Czechoslovakian courts, the witness said, that although on the face of them, they indicated reciprocity, actually they were misleading. This was so because the land would escheat to the state if not tilled and yet it could not be sold. He further stated that the decrees, although they transfer title of land to American heirs, mean nothing because a Czechoslovakian citizen who joins the Uniform Agricultural Cooperative has only bare title and no rights to any benefit from the land. When questioned as to whether there were any Agricultural Cooperatives in June of 1946, the witness claimed that there were some on the border regions. He admitted, however, that the first law concerning Uniform Agricultural Cooperatives was not passed until three years later, in 1949, which would make it after the Communist coup, when the Democratic government of President Benes was overthrown.

Dr. Rozehnal was the respondent's only authority on the question of reciprocity. The State introduced no evidence to substantiate the testimony of its sole witness. The testimony of this witness, in the main, was directed to matters which were not in issue. He spoke mostly of the laws which were in effect after the date in question, and then he was primarily concerned with the transmittal of funds in and out of the country. On cross-examination Dr. Rozehnal indicated what he believed was required to have "reciprocity of inheritance," this, as we pointed out previously, differs from what this court has required. This detracts from the weight which can be given his testimony. Not once in his testimony did he cite a single instance where an American was discriminated against by the Czechoslovakian courts.

This court is well aware of the time-honored rule that a finding of fact made by the trial court below should not be disturbed on appeal unless the evidence clearly preponderates against it. However, this court would be derelict in its duties

if it did not reverse a finding where such was the case. Such is the case here. The appellants, in the lower court presented a wealth of evidence to support their contention that reciprocity of inheritance existed between the United States and the Republic of Czechoslovakia on June 10, 1946; whereas, the respondent presented a single witness, who throughout most of his testimony testified as to matters other than the point in issue.

The law in this case relates back to the law as it existed in 1946, and not to the law as given to us by the Legislature by the 1951 amendment. Had the Legislature intended a different result it was their privilege to so legislate. By 1951, the world was well aware of the political facts of life so far as the Czechoslovakian people were concerned. The Communists had overthrown the Democratic Government of the country and had purged President Benes. We were aware then, as we are now, that in judging the credibility of statements made by officials of a Communist controlled country the state of affairs existing within their borders did not always compare with the actual facts. The Legislature should have been aware that the chances for legatees who were Nationals of a foreign country actually getting money out of that country were questionable. The Legislature could have amended our statute, as was done by the Oregon Legislature to require of foreign countries that before foreign legatees or heirs can receive property from estates of persons dying in this state that there must be a showing that citizens of the United States who are heirs or legatees to estates in that country have a right at the time the estate is ready for distribution to take said estate from that country without confiscation, in whole or in part, by that country. See Oregon Revised Statutes, 111.070. Such legislation would fill a needed gap in our present law in dealing with such cases.

The evidence in question fails to sustain the trial court's finding that reciprocity of inheritance did not exist on June 10,

1946, and its conclusions of law and decree are contrary to law. Accordingly, the decree is reversed and the cause remanded to the district court with directions to set aside, vacate and strike the trial court's finding and conclusions and to enter a judgment for the petitioners.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICE CASTLES concur.

MR. JUSTICE DOYLE (specially concurring) :

With reluctance and repugnance, I find myself compelled by reason of my oath of office to concur in this decision.

No man will ever know, if he be mentally honest, the mental torture and problems into which fate and destiny have hurtled him, as a member of an appellate court.

It is my opinion the named beneficiaries of this estate will never personally receive a penny, or enjoy any part of its largess.

Supporting this premise is the book by Karl Marx, written in 1847, which volume has been deified by the Communists of this earth entitled the "Communist Manifesto." It states that the proletarian society shall abolish all right of inheritance. In this year of 1963, the Central Committee of the Communinst Party of the U.S.S.R. issued the following directive to all of its member. "We fully stand for the destruction of imperialism and capitalism. We not only believe in the inevitable destruction of capitalism, but also are doing everything for this to be accomplished by way of the class struggle, and *as soon as possible.*"

Hence, in affirming this decision the writer is knowingly contributing financial aid to a Communist monolithic satellite, fanatically dedicated to the abolishing of the freedom and liberty of the citizens of this nation.

By reason of self-hypnosis and failure to understand the aims and objective of the international Communist conspiracy, in the year 1946, Montana did not have statutes to estop us from

86

making cash contributions to our own ultimate destruction as a free nation. This statute, section 91-520, R.C.M.1947, as amended, can and should be further amended by the following language "Upon strict proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from the estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries," thus forever precluding a comparable situation such as this to again arise.

Unable to find any loophole, escape hatch or valid legal reason to ignore the cases of In re Nielsen's Estate, 118 Mont. 304, 165 P.2d 792; In re Estate of Gaspar, 128 Mont. 383, 275 P.2d 656; In re Estate of Spehar, 140 Mont. 76, 367 P.2d 563, previously decided by this court, I find myself agreeing to put another strand in the rope that will strangle the liberty of the people of the shrinking free world.

I do not want it to be understood that this writer is critical of these prior decisions of this Court. My brethren were obligated to follow the law as it was then written and abjure their personal beliefs.

MR. JUSTICE ADAIR (dissenting) :

I dissent for the reasons and upon the grounds stated by me in my dissenting opinions in the cases of In re Stoian's Estate, 128 Mont. 52, at pp. 59, 60 and 61, 269 P.2d 1085, and In re Estate of Stoian, 138 Mont. 384, at p. 396, 357 P.2d 41, and for the reasons stated by Mr. Justice Bottomly in In re Stoian's Estate, 128 Mont. 52 at pp. 61 to 65, inclusive; 269 P.2d 1095, and also his dissent in In re Spoya's Estate, 129 Mont. 83, at pp. 94 and 95, 282 P.2d 425.