20 Cal.App.3d 137 (1971)
97 Cal. Rptr. 510
Estate of CHARLES TISCHLER, Deceased.
CON S. SHEA, as Public Administrator, etc., Plaintiff and Respondent
v.
THE STATE OF CALIFORNIA, Objector and Respondent.
CAROL ROLAND TISCHLER, a Minor, etc., Claimant and Appellant.
Docket No. 29278.
Court of Appeals of California, First District, Division Four.
September 20, 1971.
*140 COUNSEL
Rose M. Fanucchi and John R. Vintilla for Claimant and Appellant.
Evelle J. Younger, Attorney General, and John E. Barsell, Jr., Deputy Attorney General, for Objector and Respondent.
No appearance for Plaintiff and Respondent.
OPINION
DAVID, J.[*]
On this appeal, we are called upon to determine whether a young Rumanian boy, Carol Roland Tischler, who is a nonresident alien, is entitled to receive the proceeds of a California bank account as heir of his father, Marc Tischler, who was the sole heir of Carol Roland Tischler's long-deceased grandfather and namesake, Carol Tischler.
The relevant facts were stipulated.
The sole asset of the estate was a bank account of Carol Tischler, alien resident of Rumania, in the Crocker-Anglo National Bank of San Francisco. On behalf of the appellant, the public administrator was appointed administrator of the estate. On July 11, 1966, he petitioned for distribution to appellant of the proceeds of the estate. This petition was denied, when the Attorney General objected, claiming the estate had escheated to the State of California, under Probate Code section 1026. Appeal from the order denying distribution to appellant followed.
(1) The Attorney General's contention that the order is not appealable is directly answered by Probate Code section 1240, which provides for an appeal from an order "determining ... the persons to whom distribution should be made." The corollary, that appeal lies when the order determines that distribution is not to be made to a specified person, necessarily is implied.
On January 21, 1970, almost three years after the Attorney General's *141 initial objections had been filed, the probate commissioner filed a supplemental report, concluding that there had been compliance with Probate Code section 1026, and proposing to distribute the proceeds of the estate to appellant. The Attorney General again objected. On March 6, 1970, Mrs. Gramescu, through her attorneys, noticed a motion to confirm the reports of the probate commissioner, and the motion was taken under submission on March 25, 1970. Sixty days later, the motion to confirm was denied by minute order, and this appeal followed.
(2a) The objector and respondent relies upon Probate Code section 1026, which provided at all relevant times as follows: "A nonresident alien who becomes entitled to property by succession must appear and demand the property within five years from the time of succession; otherwise, his rights are barred and the property shall be disposed of as escheated property."
Under the facts and law deemed controlling, we hold (1) that the national emergency and legislation applicable during World War II tolled Probate Code section 1026 (Estate of Horman (1971) 5 Cal.3d 62, 70 [95 Cal. Rptr. 433, 485 P.2d 785]) and (2) that in law and in fact, those entitled did appear and demand their inheritance within the specified time.
Hence, the order denying distribution of the proceeds of the estate to Debora Gramescu, as legal guardian of Carol Roland Tischler, a minor, should be reversed, and distribution ordered, as prayed.
Presidential Executive Order No. 8389, sections 1 and 3, subdivision (e), 5 Code of Federal Regulations 1400, as of April 10, 1940, and Executive Order No. 8565, 5 Code of Federal Regulations 4062, blocked all transfers of funds from United States banks to Rumania. (12 U.S.C.A. § 95a, note.) This froze the $4,000 commercial account in the Crocker-Anglo Bank in San Francisco, maintained by Carol Tischler, a resident of Rumania. Thereafter Tischler died intestate in Rumania on March 4, 1942. His sole heir was his son, Marc Tischler.
On June 5, 1942, Congress declared war against Rumania. (Cong. Res. June 5, 1942, c. 325.) Thereupon the Trading With the Enemy Act (50 U.S.C.A.App. §§ 1-43, p. 19 et seq.) went into effect. (Markham v. Cabell (1945) 326 U.S. 404 [90 L.Ed. 165, 66 S.Ct. 193].) The assets of alien nations were transferred to the legal custody of the alien property custodian, by section 6 of that act. (Ex. Order No. 9095, as amended, 50 U.S.C.A. App. § 6, notes; 7 C.F.R. 1971, 5205; 10 C.F.R. 6917.)
Thus, the alien property custodian was vested completely with title, and was entitled to possession of, the assets of nonresident Rumanian aliens, for benefit of the United States. (Markham v. Taylor (S.D.N.Y. 1947) 70 F. Supp. 202, app. dism. 163 F.2d 940, affd. 169 F.2d 324, affd. 337 U.S. *142 472 [93 L.Ed. 1480, 69 S.Ct. 1333], rehg. den. 338 U.S. 841 [94 L.Ed. 514, 70 S.Ct. 33]; cf. Estate of Zimmermann (1955) 132 Cal. App.2d 702 [283 P.2d 68]; In re Gaspar's Estate (1954) 128 Mont. 383 [275 P.2d 656] [Rumanian heirs].)
Likewise, as pertaining to appearance and claim of Rumanian heirs, the Trading With the Enemy Act, supra, section 3(c), prohibited, except under Presidential license, any correspondence with an enemy alien. (United States v. Krepper (3d Cir.1946) 159 F.2d 958, cert. den., 330 U.S. 824 [91 L.Ed. 1275, 67 S.Ct. 865]; Welsh v. United States (2d Cir.1920) 267 F. 819, mandamus den. 254 U.S. 607-608 [65 L.Ed. 435, 41 S.Ct. 6]; cf. Farmers etc. Nat. Bk. v. Superior Court (1945) 25 Cal.2d 842, 843 [155 P.2d 823].)
By Executive Order No. 9788, effective October 14, 1946 (11 C.F.R. 11981), the function of the alien property custodian was transferred to the Attorney General.[1] Formal cessation of hostilities (Proclamation No. 2714, 12 C.F.R. 1) came on December 31, 1946. A treaty of peace was not concluded with Rumania until February 10, 1947, thereby terminating the restrictions under the Trading With the Enemy Act. But the treaty of peace in Article 27 provided:

"ARTICLE 27
"1. Each of the Allied and Associated Powers shall have the right to seize, retain, liquidate or take any other action with respect to all property, rights and interests which at the coming into force of the present Treaty are within its territory and belong to Roumania or to Roumanian nationals, and to apply such property or the proceeds thereof to such purposes as it may desire, within the limits of its claims and those of its nationals against Roumania or Roumanian nationals, including debts, other than claims fully satisfied under other Articles of the present Treaty. All Roumanian property, or the proceeds thereof, in excess of the amount of such claims, shall be returned.
"2. The liquidation and disposition of Roumanian property shall be carried out in accordance with the law of the Allied or Associated Power concerned. The Roumanian owner shall have no rights with respect to such property except those which may be given him by that law." (1947 U.S. Code Cong. 8 Admin. Service, pp. 2464-2465.)
In 1957, dealings in reference to funds in the United States belonging *143 to Rumanian nationals still were blocked and inhibited by Presidential Executive Orders No. 9989 of August 20, 1948, and No. 10348 of April 28, 1952.
On March 30, 1960, an agreement was made between United States and Rumania which provided in part as follows: "The Government of the United States of America will release within 30 days of the date of this Agreement its blocking controls over all Rumanian property in the United States of America." (T.I.A.S. 4451, 11 U.S.T. 317, 319.) The release was given, apparently, as the bank was able to turn over the funds to the administrator.
As to Rumanian heirs, the operation of Probate Code section 1026 was tolled from April 10, 1940, to and including the effective date of the 1960 agreement. (Estate of Caravas (1952) 40 Cal.2d 33, 42 [250 P.2d 593].) During this period, as indicated above, the original depositor, Carol Tischler, died on March 4, 1942. His son and sole heir, Marc Tischler, died on September 19, 1957; and his son and sole heir, appearing by his guardian, is appellant.
In Estate of Caravas, supra, 40 Cal.2d 33, the interrelation of Probate Code sections 1026 and 1027 was explained. By section 1026, as a substantive rule, the estate of a nonresident decedent escheats to the state unless the nonresident alien heir appears and demands the property within five years from the time of succession. To "appear and demand" is readily defined, if an estate is probated, and is pending within five years of the death of the decedent. (Estate of Horman, supra; cf. Prob. Code, § 1027.)
But not all situations fit into the presuppositions of the code provisions, and the current chain of circumstances is one of such situations.
Marc Tischler, the son of Carol Tischler and his sole heir, on November 29, 1946, wrote to the Crocker-Anglo Bank concerning the deposit, to which he was heir, and on January 31, 1947, was advised the bank was unable to disburse the sum to him because of the Trading With the Enemy Act. As noted above, the treaty of peace with Rumania had not yet been signed, the property in legal effect was still in the hands of the Attorney General of the United States, and remained so until April 1960.
We conclude that by this contact, Marc Tischler had both appeared and claimed his property, and there could be no unknown owner nor inference of abandonment of the funds by him. Marc Tischler died in Rumania on September 19, 1957, before any restoration of funds to alien owners, and Carol Roland Tischler, his minor son and heir, thereupon succeeded to ownership. At the time of Marc's death in 1957, the bank account was still *144 blocked by the executive orders, and continued so, until the agreement of March 30, 1960, provided for unblocking such accounts within 30 days.
On July 4, 1960, on behalf of the son, Mrs. Debora Tischler (now Gramescu) wrote the bank, asking for the proceeds of the account. We interpret this, also, as an appearance and claim well within five years of Carol R. Tischler's succession. (Cf. Taylor v. Western States Land etc. Co. (1947) 77 Cal. App.2d 869, 874 [176 P.2d 975].)
This was followed by the institution of the present administration in probate at the instance of the claimant.
In response to the claim to the bank account made by the guardian for petitioner, the bank replied that it would be necessary to probate the estate in California, and that "in order to be as helpful as possible" it would refer the matter to the public administrator. Since nonresidents cannot qualify as administrators, the public administrator is the proper person. (Prob. Code, §§ 420, 422, subd. (8); Estate of Beech (1883) 63 Cal. 458.) Over a period of two years, on behalf of the heir, the public administrator was supplied the necessary documentation, including letters appointing his mother (now remarried, Debora Gramescu) guardian of the heir, Carol Roland Tischler. The public administrator filed his petition for administration on June 27, 1961, well within five years after the death of Marc Tischler. It is stipulated that commencing July 4, 1960, Debora Gramescu (the guardian) began a series of correspondence with said bank and public administrator relating to the claim, and presented as exhibits to the probate court, which file we have examined.
After having notified the guardian that the estate was about to close, on November 26, 1962, the administrator advised that distribution would be held up, until legal reciprocity of inheritance between United States and Rumania could be shown, and that litigation was pending on the question. This question was not resolved definitely until the decision of the Supreme Court in Estate of Chichernea (1967) 66 Cal.2d 83 [57 Cal. Rptr. 135, 424 P.2d 687].
On July 7, 1966, while this matter was still pending, the public administrator wrote the guardian, "It is our understanding that at the present the Attorney General's office will not object to the distribution of this estate since the laws of Rumania would apply.[[2]] We are therefore applying to the *145 Court for a decree ... to distribute the estate to you as guardian of your minor son."
The petition for distribution was filed in due course. The probate commissioner filed his report on May 4, 1967, concluding that distribution should be made to Debora Gramescu, as tutorial guardian for Carol Roland Tischler. Well beyond the five-day period for objections (Code Civ. Proc., § 259, subd. 2), the Attorney General appeared, urging that Probate Code section 1026 required that an escheat to the State of California be declared, contending that Carol Roland Tischler was barred, because he had made no claim to his grandfather's estate within five years of the death of his grandfather. (Carol R. was not born until 13 years after his grandfather's death.) But we conclude that Marc Tischler, under the circumstances, had appeared and claimed the bank deposit within the five-year period; and that the state of war and wartime restrictions tolled the five-year period in any event; and that Marc Tischler's heir acted specifically within the time limit of Probate Code section 1026.
Until the account was released by the alien property custodian and was unblocked by the international agreement in 1960, any appearance and demand, probate proceeding, or appellate remedy would have been futile because of the absolute federal bar prohibiting the transfer of funds from blocked accounts to Rumania; and because the assets were held by the United States. While we cannot and do not describe all of the "appropriate circumstances" (Estate of Horman, supra, 5 Cal.3d 62 at p. 71) in which tolling may occur, the facts of this case clearly disclose such a set of circumstances, and the requirement of Probate Code section 1026 was accordingly tolled, as to any claim of Marc Tischler.
(3) The requirement of appearing and demanding within five years from the date of the decedent's death is a proper subject for tolling under appropriate circumstances. (Estate of Horman, supra, 5 Cal.3d 62 at p. 70-71; Estate of Caravas, supra, 40 Cal.2d 33 at pp. 41-42; Estate of Spinosa (1953) 117 Cal. App.2d 364, 370-371 [255 P.2d 843].) Futility or such impracticability as to amount to practical impossibility are proper grounds for tolling, analogous to the exceptions to the mandatory five-year trial requirement of Code of Civil Procedure section 583. (Estate of Horman, supra, at p. 71.)
(2b) We conclude that, in any event, there was substantial compliance with Probate Code section 1026.
*146 Under the wartime restrictions, there was little more that could have been done. (4a) There is no prescribed procedure for a claimant to "appear and demand" within the meaning of that section (Estate of Horman, supra, 5 Cal.3d 62, 72; Estate of Sorensen (1955) 44 Cal.2d 306, 309 [281 P.2d 870]; Estate of Aufret (1921) 187 Cal. 34, 37 [200 P. 946]; State v. Smith (1886) 70 Cal. 153, 156 [12 P. 121].) The Attorney General's contention that a person must "appear" in this state, either in person or by an assignee, in a formal proceeding, is utterly without merit, though such appearance under some circumstances may be formal. (Cf. Prob. Code, § 1027.) Patently, a claimant need not appear in person. (Carrasco v. State of California (1885) 67 Cal. 385 [7 P. 766]; Lyons v. State of California (1885) 67 Cal. 380 [7 P. 763].) Nor must he appear in a formal proceeding, since an "appearance and demand" may be made in pais. (State v. Smith, supra, 70 Cal. 153 at pp. 156-157.) (5) By definition, when one acts in pais, he acts "without legal formalities or proceedings." (Bouvier's Law Dict. (3d rev.) p. 1523.) (4b) More recently, it has been determined that "any act by which [a claimant] makes known to the person possessing or controlling [the property] his claim of interest suffices." (Estate of Sorensen, supra, 44 Cal.2d 306 at p. 309. Italics supplied.)
(6) The Attorney General next contends that even if Marc's letter was sufficient to constitute an appearance and demand, the property still must escheat because the "statute of limitations" in Probate Code section 1026 began to run again from the time of that letter, and expired five years thereafter. The contention is without merit. The Attorney General took the contrary position in Estate of Horman, supra, by contending that the limitation in Probate Code section 1026 was substantive, rather than procedural. He was successful in his contention there, and we perceive no valid reason for permitting him to contend to the contrary on this appeal.
In Estate of Horman, supra, it was recognized that section 1026 was substantive rather than procedural (id., at p. 70); i.e., the nonresident alien succeeded to the property at the death of the decedent, subject to the condition subsequent that he appear and demand within five years of the date of death. (See Estate of Sorensen, supra, 44 Cal.2d 306 at p. 308; Estate of Pendergast (1904) 143 Cal. 135, 140 [76 P. 962].) Viewed in this light, Marc's letter to the bank in 1946 fulfilled the condition subsequent, and the estate vested in him unconditionally.
(2c) The statutes and orders described above rendered Marc Tischler incapable to secure his inheritance, the bank account of his father.
We see no reason for departing from this liberal rule here, and the Attorney *147 General has suggested none. Moreover, a liberal construction of the phrase "appear and demand" comports with the notion that escheats are not for the benefit of a sovereign, as such, but merely a disposition of property in the absence of known heirs. Here, the bank's reply to Marc's letter clearly indicated that he made his presence known as a claimant to the bank account, and the purpose of the "appear and demand" requirement has been met.
(7) Paraphrasing the decision of the Supreme Court in Umbsen v. Crocker First Nat. Bank (1949) 33 Cal.2d 599, 603 [203 P.2d 752], we conclude that the claimant and appellant has established his right to the fund. That conclusion is consistent with the purpose of Probate Code section 1026. That act is not like a statute that requires the forfeiture of property for some wrongful conduct. It is designed to free property within the state from the dead hand of absent, unknown owners after a reasonable period. It is not designed to be an expropriation of property of foreign resident owners who are known and who have established their property right to the fund.
(8) The public policy of California has been expressed in the adoption of the Uniform Disposition of Unclaimed Property Act (Code Civ. Proc., §§ 1500-1527) whose purpose is to locate and restore property to owners, rather than to claim it by escheat. (Cf. State of California v. Pacific Far East Line, Inc. (1968) 261 Cal. App.2d 609 [68 Cal. Rptr. 67]; Douglas Aircraft Co. v. Cranston (1962) 58 Cal.2d 462, 463 [24 Cal. Rptr. 851, 374 P.2d 819, 98 A.L.R.2d 298].)
Escheat of estates is not favored. (Estate of Spinosa, supra, 117 Cal. App.2d 364, 372.)
The order denying distribution to appellant is reversed, with directions to enter an order for distribution of the proceeds to appellant, as prayed, and denying escheat to the State of California. Costs to appellant.
Devine, P.J., and Christian, J., concurred.
NOTES
[*] Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.
[1] By Executive Order No. 11281 of May 13, 1966, 31 Code of Federal Regulations 7215, jurisdiction over blocked assets was transferred from the Attorney General to the Secretary of the Treasury.
[2] As of the date of succession, the law of the domicile governed personalty. (Estate of Moore (1961) 190 Cal. App.2d 833 [12 Cal. Rptr. 436]; Estate of Nolan (1955) 135 Cal. App.2d 16 [286 P.2d 899, 50 A.L.R.2d 1369], citing Civ. Code, § 946, and holding that Prob. Code, § 231 [akin to § 1026] relative to escheat, is not law to the contrary.) The present provisions of Probate Code sections 231-236 were not then in effect. The law at the date of succession is applicable. (Estate of Lindquist (1944) 25 Cal.2d 697 [154 P.2d 879].)