Ali SHAMES, Ahmed Shames, Buda Shames and Samira Shames, Heirs, Plaintiffs,

v.

STATE OF NEBRASKA, Clarence A. H. Meyer, Attorney General for State of Nebraska, Norbert Tiemann, Governor of the State of Nebraska, Paul Robinson, County Attorney of Cedar County, Nebraska, Judge Joseph Marsh, Judge of the District Court of Cedar County, Nebraska, and Max Goetz, Administrator of the Estate of Hussan James, a/k/a Hussan Shames in Cedar County, Nebraska, Defendants.

Civ. No. 03255.

United States District Court, D. Nebraska.

Feb. 11, 1971.

Phillip S. Dandos, Sioux City, Iowa, and Mohummed Sadden, South Sioux City, Neb., for plaintiffs.

**1322**

Clarence A. H. Meyer, Atty. Gen., and Bernard L. Packett, Asst. Atty. Gen., State of Neb., for defendants.

Before LAY, Circuit Judge, and ROBINSON and VAN PELT, District Judges.

## MEMORANDUM

ROBINSON, District Judge.

This matter comes before the Court on defendant's motion to dismiss, on plaintiff's motion to convene a Three-Judge District Court to enjoin the enforcement and execution of the provisions of Sections 76–401 and 76–402 Revised Statutes of Nebraska 1943 and for a determination on the merits of the relief prayed for. By the Order of this Court dated May 8, 1970, it was decreed that a trial and argument be set for June 1, 1970, before a Three-Judge District Court. In the interest of judicial expediency the defendants' motion to dismiss and the merits of the case were argued and taken under advisement. Accordingly, before this panel can reach the constitutional issues it first must be determined if the motion to dismiss is to be sustained or overruled.

Hussan Shames died intestate on July 4, 1962 in Sioux City, Woodbury County, Iowa. The decedent was a resident of that county and state. He left as his only heirs the four plaintiffs in this action who are nationals and residents of Syria. The main probate of the decedent was commenced in Woodbury County District Court, Sioux City, Iowa, and an auxiliary probate was opened in Cedar County Court, Hartington, Nebraska, on July 6, 1963. This auxiliary proceeding was commenced to probate certain real estate the decedent owned in Nebraska. The State of Nebraska intervened in the probate proceedings and asked that the Nebraska estate of Hussan Shames escheat to the State of Nebraska for failure of qualified heirs to take. The Probate Court entered a decree January 23, 1969, in which it said the real estate escheated to the State of Nebraska. An appeal has been taken by plaintiffs from this decree to the District Court of Cedar County, Nebraska. This Panel was advised at the oral arguments that the District Court has refrained from ruling on the appeal and will so refrain until this Court renders its decision in the matter.

Defendants have urged that the Court should abstain from entertaining the substantive issues and allow the Nebraska state courts to dispose of the constitutional challenges herein raised. In recent years there has been frequent recognition of situations in which a federal court may decline to proceed though it has jurisdiction under the Constitution and the Statutes.[1] Abstention by federal courts stems from Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). There the court affirmed a federal district court's refusal to issue an injunction against the Texas Railroad Commission until the State Courts had an opportunity to void the commission action on State law grounds. Justice Frankfurter speaking for the court said:

"The last word on the meaning of Article 6445 of the Texas Civil Statutes [the challenged state statute] and therefore the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication: Glenn v. Field Packing Co., 290 U.S. 177 [54 S.Ct. 138, 78 L.Ed. 252]; Lee v. Bickell, 292 U.S. 415 [54 S.Ct. 727, 78 L.Ed. 1337]. The reign of law is hardly promoted if an unneces-

---

1. For a thorough and recent discussion of the development of the "abstention doctrine" and cases in which it has been applied and rejected see: Eugene Keilin, "Abstention from Jurisdiction: Accommodation or Abdication" 23 Ark.L.Rev. 412 [1969].

sary ruling of a federal court is thus supplanted by a controlling decision of a state court." 312 U.S. at 499–500, 61 S.Ct. at 645.

The abstention doctrine reached its broadest definition in four decisions handed down June 8, 1959.[2] These decisions reaffirmed the basic doctrine underlying abstention, that is that federal courts should stay the federal proceeding in "special circumstances" principally, when a challenged statute is open to an interpretation and construction that could possibly avoid the constitutional issue. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 [1959].

However, in Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 [1967] abstention was substantially limited. In *Zwickler* the appellant was challenging the constitutionality of a New York statute which prohibited, among other things, the distribution of handbills concerning any candidate for an elected or public office unless there was printed thereon the name and post office addresses of the printer of said handbill and the name of the person who ordered the said handbill to be distributed. A three-judge court applied the absention doctrine and dismissed the complaint. Zwickler v. Koota, 261 F.Supp. 985 [E.D.N.Y.1966]. The Supreme Court reversed, holding that there were no "special circumstances" which required the application of the absention doctrine. Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.

2d 444.[3] The court felt that there was no possible construction of the statute which could avoid the constitutional issues raised.

In a recent case, Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 [1970], the Supreme Court reversed a decision of the three-judge panel where the lower court had refused to apply abstention and held an Act of Alaska and the regulations passed pursuant to that statute unconstitutional under the Equal Protection clause of the Fourteenth Amendment and under the Constitution of Alaska. The High Court felt that the state court decision in interpreting the Alaska Constitution could "conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship." The court cited approvingly language from City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562 (1959) where it was said:

> "Proper exercise of federal jurisdiction requires that controversies involving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the underlying federal constitutional questions. * * *" 358 U.S. at 640, 79 S.Ct. at 456.

In the present case however, there are no unsettled questions of state law. In Semrad v. Semrad, 170 Neb. 911, 104 N.W.2d 338 [1960] the Supreme Court of Nebraska fully interpreted the state statutes herein challenged.[4] Thus our sit-

2. Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 [1959]; Harrison v. N.A.A.C.P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 [1959]; County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 [1959]; Martin v. Creasy, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186 [1959].

3. The court said: "The judge-made doctrine of abstention, first fashioned in 1941 in Railroad Commission v. Pullman Co., 312 U.S. 496 [61 S.Ct. 643, 85 L.Ed. 971], sanctions such scope only in narrowly limited 'special circumstances.'

Propper v. Clark, 337 U.S. 472, 492 [69 S.Ct. 1333, 93 L.Ed. 1480]."

4. In reference to Section 76–401 R.R.S. 1943, the Court in Semrad said: "This section precludes a nonresident alien from acquiring or taking any title or interest in lands in this state by descent, devise, purchase, or otherwise, except as to such lands as are within the exceptions provided in the act." In regard to Section 76–401 the court said: The words 'failure of heirs' contained in 76–401, R.R.S.1943, mean an absence of heirs competent to take by descent or devise. Construing the applicable statutes pari

uation here is analogous to Zwickler v. Koota, *supra*, where it was determined that abstention did not apply for the challenged state statutes or constitution were not open to interpretation that could avoid the constitutional issue. Accordingly this Court does not deem abstention applicable to the case at hand, and defendant's motion to dismiss on the grounds of abstention should be overruled.

Proceeding now to the issue of the constitutionality of the challenged statutes:

The four plaintiffs in this action ask the Court to enjoin the enforcement and execution of Section 76–401 and 76–402 R.R.S.1943,[5] by Judge Joseph Marsh of the District Court of Nebraska, in and for Cedar County; the State of Nebraska, through its Attorney General, Clarence A. H. Meyer; Governor Norbert Tiemann; Paul Robinson, County Attorney of Cedar County, Nebraska; and Max Goetz, Administrator of the Estate of Hussen James in Cedar County, Nebraska, because such enforcement and execution would allegedly constitute an

unconstitutional intrusion into the field of foreign affairs which the Constitution of the United States entrusts to the President of the United States and Congress. Plaintiffs further allege that when construed together the two statutes deprive them of property without due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution. They also contend that when the two statutes are read in conjunction with Section 76–414 R.R.S.1943,[6] which excepts property within three miles of the corporate limits of any city or town from the operation of Sections 76–401 and 402, they are deprived of equal protection of the law as guaranteed by the equal protection clause of the Fourteenth Amendment to the United States Constitution. Finally plaintiffs argue that the statutes in question deprive the decedent of the right to dispose of his property as he wishes, and therefore deprive him of his liberty without due process of law, as guaranteed to him by the Fourteenth Amendment to the United States Constitution.[7]

materia [Section 76–401 and 76–402 R.R.S.1943], an alien heir who cannot take by purchase cannot take by descent or devise."

5. The statutes which plaintiffs challenge read as follows:
"76–401. *Escheats: when title vests in state.* Upon the failure of heirs, the title shall vest at once in the state, without an inquest or other proceedings in the nature of office found."
"76–402. *Aliens and foreign corporations; real estate; ownership prohibited.* Aliens and corporations not incorporated under the laws of the State of Nebraska are prohibited from acquiring title to or taking or holding any land, or real estate, or any leasehold interest extending for a period for more than five years or any other greater interest less than fee in any land, or real estate in this state by descent, devise, purchase or otherwise, except as provided in sections 76–403 to 76–405."

6. Section 76–414 provides:
"*Act; not applicable to real estate within cities and villages, or within three miles thereof; not applicable to manufacturing or industrial establishments.*

The provisions of sections 76–402 to 76–413 shall not apply to any real estate lying within the corporate limits of cities and villages, or within three miles thereof, nor to any manufacturing or industrial establishment referred to in section 76–413."

7. Nebraska has another statute which affects the inheritance rights of non-resident aliens that was passed in 1963. The probate proceedings out of which this case arose were begun in 1962 and hence that statute does not apply to their case. As a matter of information, that statute reads as follows:
"4–107. *Nonresident; alien; property by succession or testamentary disposition; taking of property in this state; conditions; escheat; disposition of escheated property.* [1] The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:
[a] Upon the existence of a reciprocal right upon the part of citizens of the

Do the Nebraska Statutes Constitute an Unconstitutional Intrustion into United States Foreign Affairs?

Section 76–402 R.R.S.1943 on its face is an absolute bar to the inheritance of any real property located in the State of Nebraska by a non-resident alien. There are, however, two exceptions to the operation of the statute, one being a legislative enactment, to-wit: the aforementioned Section 76–414 R.R.S.1943, which exempts land located within three miles of the corporate limits of any city or town; the other exception, being of judicial origin, is that whenever the United States has a treaty with a foreign nation declaring that residents of that nation shall have the right to inherit from citizens of the United States, the Nebraska Supreme Court will enforce such rights without regard to any statutory provisions of the State. See Erickson v. Carlson, 95 Neb. 182, 145 N.W. 352 [1914].

Although Section 76–402 R.R.S.1943, aside from the two aforesaid exceptions, bars non-resident aliens from inheriting realty located in Nebraska, it does not of itself result in an automatic escheat to the state of any Nebraska land willed or

United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such alien is an inhabitant;

[b] Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

[c] Upon proof that such nonresident alien heirs, distributees, devisees, or legatees may receive the benefit, use, or control of property or proceeds from estates of persons dying in this state without confiscation in whole or in part, by the governments of such foreign countries.

[2] The burden is upon such nonresident alien to establish the fact of existence of the reciprocal rights set forth in subsection [1] of this section.

[3] If such reciprocal rights are not found to exist, the property shall be delivered to the State Treasurer to be held for a period of five years from date of death during which time such nonresident alien may show that he has become eligible to receive such property. If at the end of such period of five years no showing of eligibility is made by such nonresident alien, his rights to such property or proceeds shall be barred.

[4] At any time within the one year following the date the rights of such nonresident alien has been barred, any other person other than an ineligible nonresident alien who, in the case of succession or testamentary disposition, would have been entitled to the property or proceeds by virtue of the laws of Nebraska governing intestate descent and distribution had the nonresident alien predeceased the decedent, may petition the district court of Lancaster County for payment or delivery of such property or proceeds to those entitled thereto.

[5] If no person has petitioned the district court of Lancaster County for payment or delivery of such property or proceeds within six years from the date of death of decedent, such property or proceeds shall be disposed of as escheated property.

[6] All property other than money delivered to the State Treasurer under this section may within one year after delivery be sold by him to the highest bidder at public sale in whatever city in the state affords in this judgment the most favorable market for the property involved. The State Treasurer may decline the highest bid and reoffer the property for sale if he considers the price bid insufficient. He need not offer any property for sale if, in his opinion, the probable cost of sale exceeds the value of the property. Any sale held under this section shall be preceded by a single publication of notice thereof at least three weeks in advance of sale in an English language newspaper of general circulation in the county where the property is to be sold and the cost of such publication and other expenses of sale paid out of the proceeds of such sale. The purchaser at any sale conducted by the State Treasurer pursuant to this section shall receive title to the property purchased, free from all claims of the owner or prior holder thereof and all persons claiming through or under them. The State Treasurer shall execute all documents necessary to complete the transfer of title."

otherwise left to a non-resident alien. In Metzger v. Metzger, 108 Neb. 613, 188 N.W. 229 (1922), the Nebraska Supreme Court held that land devised to non-resident aliens incapable of acquiring an interest therein must be regarded as intestate property descendable as provided by law, to the next of kin who are capable of taking. However, when there are no next of kin residing in the United States capable of taking, the Nebraska realty which a decedent has attempted to leave a non-resident alien, it does escheat to the state by virtue of 76–401 R.R.S.1943, the other statute which plaintiffs challenge as being unconstitutional.

In challenging the two aforementioned statutes as an unconstitutional intrusion into the field of foreign affairs, plaintiffs rely heavily on the United States Supreme Court's decision in Zschernig v. Miller, 389 U.S. 429, 88 S. Ct. 664, 19 L.Ed.2d 683 [1968].

In *Zschernig* the appellants, residents of East Germany, were the sole heirs of an Oregon resident who died intestate, leaving personal property. The appellees were members of the State Land Board who petitioned the Oregon Probate Court for the escheat of the personalty under an Oregon Statute [8] which provided for escheat in cases where a non-resident alien claims real or personal property unless: [1] there was a reciprocal right of a United States citizen to take property on the same terms as the citizen of the foreign nation, [2] American citizens had the right to receive payment here of funds from estates in the foreign country, and [3] foreign heirs had the right to receive the proceeds of Oregon estates without confiscation. The Oregon Supreme Court held that appellants could not take the personalty, because the reciprocity required under the statute was not present. The United States Supreme Court, in an opinion written by Justice Douglas, reversed holding that the statute as applied involved the State in foreign affairs and international relations, matters which the Constitution entrusts solely to the Federal Government. This Court interprets *Zschernig* as concerned primarily with the application of the reciprocity clause of that statute by the Oregon Probate Courts.

Unlike the Oregon statute, the Nebraska statute herein challenged does not contain such a reciprocity provision or any provision which concerns itself with the application of the statute. If it did contain such a provision it would not be unconstitutional on its face but would become so only if it was applied in such a manner as to intrude upon the foreign affairs of the United States.

That the application of the Oregon statute was the concern of the court in *Zschernig* is evidenced by the Court's

8. Oregon Revised Statutes Sec. 111.070 [1957] reads as follows:

"[1] The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:

"[a] Upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such alien is an inhabitant or citizen;

"[b] Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

"[c] Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries. "[2] The burden is upon such non-resident alien to establish the fact of existence of the reciprocal rights set forth in subsection [1] of this section. "[3] If such reciprocal rights are not found to exist and if no heir, devisee or legatee other than such alien is found eligible to take such property, the property shall be disposed of as escheated property."

refusal to overrule its prior decision in Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 [1947].

In Clark v. Allen, the Court held that a general reciprocity clause [9] did not on its face intrude upon the federal domain in the handling of foreign affairs. 331 U.S. at 516–517, 67 S.Ct. 1431. The court noted that the California statute would have only "some incidental or indirect effect in foreign countries." *Id.,* at 517, 67 S.Ct., at 1439.

In *Zschernig* the Court said of Clark v. Allen:

"Had that case appeared in the posture of the present one, a different result would have obtained. We were there concerned with the words of a statute on its face, not the manner of its application. State courts, of course, must frequently read, construe, and apply laws of foreign nations. It has never been seriously suggested that state courts are precluded from performing that function, albeit there is a remote possibility that any holding may disturb a foreign nation * * *." 389 U.S. at 433, 88 S.Ct. at 667.

The court went on to say:

" * * * It now appears that in this reciprocity area under inheritance statutes, the probate courts of various States have launched inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called 'rights' are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation." 389 U.S. at 433–434, 88 S.Ct. 667.

The Court said the Oregon statute had, " * * * more than 'some incidental or indirect effect in foreign countries,' and its great potential for disruption or embarrassment makes us hesitate to place it in the category of a diplomatic bagatelle." 389 U.S. at 434–435, 88 S.Ct. at 667. The statute had introduced the concept of "confiscation", which had " * * * led into minute inquiries concerning the actual administration of foreign law, * * * " 389 U.S. at 435, 88 S.Ct. at 668.

That Oregon probate courts had severely criticized certain foreign nations [10] and had thereby caused an ad-

9. Section 259, California Probate Code, in 1942 provided:
   "The rights of aliens not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens and upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign countries."

Section 259.2 provided:
   "If such reciprocal rights are not found to exist and if no heirs other than such aliens are found eligible to take such property, the property shall be disposed of as escheated property."
   "The condition with respect to receipt of moneys in the United States was repealed in 1945, while the Clark case was pending. Cal.Stats.1945, c. 1160, § 1, effective September 15, 1945. Under the original act, the non-resident aliens had the burden of establishing the fact of existence of the reciprocal rights. § 259.1. By the 1945 amendment the burden of establishing the non-existence of such reciprocal right was placed on him who challenged the right of the non-resident aliens to take. Section 259.2 was repealed."

10. The following is footnote 8 of the majority opinion in *Zschernig*, and sets out

verse affect upon the foreign dealings and affairs of the United States, was the evil which the *Zschernig* decision was intended to alleviate. As Justice Douglas

the evil that the decision sought to prohibit:

"Such attitudes are not confined to the Oregon courts. Representative samples from other States would include statements in the New York courts, such as 'This court would consider sending money out of this country and into Hungary tantamount to putting funds within the grasp of the Communist,' and 'If this money were turned over to the Russian authorities, it would be used to kill our boys and innocent people in Southeast Asia. * * *' Heyman, The Nonresident Alien's Right to Succession Under the 'Iron Curtain Rule,' 52 Nw.U.L.Rev. 221, 234, [1957]. In Pennsylvania, a judge stated at the trial of a case involving a Soviet claimant that 'If you want to say that I'm prejudiced, you can, because when it comes to Communism I'm a bigoted anti-Communist.' And another judge exclaimed, 'I am not going to send money to Russia where it can go into making bullets which may one day be used against my son.' A California judge, upon being asked if he would hear argument on the law, replied, 'No, I won't send any money to Russia.' The judge took 'judicial notice that Russia kicks the United States in the teeth all the time,' and told counsel for the Soviet claimant that 'I would think your firm would feel it honor bound to withdraw as representing the Russian government. No American can make it too strong.' Berman, Soviet Heirs in American Courts, 62 Col.L.Rev. 257, and n. 3 [1962].

"A particularly pointed attack was made by Judge Musmanno of the Pennsylvania Supreme Court, where he stated with respect to the Pennsylvania Act that:

'It is a commendable and salutary piece of legislation because it provides for the safekeeping of these funds even with accruing interest, in the steelbound vaults of the Commonwealth of Pennsylvania until such time as the Iron Curtain lifts or sufficiently cracks to allow honest money to pass through and be honestly delivered to the persons entitled to them. Otherwise, wages and other monetary rewards faithfully earned under a free enterprise democratic system could be used by Communist forces which are committed to the very destruction of that free enterprising world of democracy.' Belemecich Estate, 411 Pa. 506, 508, 192 A.2d 740, 741, rev'd, sub nom. Counsul General

of Yugoslavia v. Pennsylvania, 375 U.S. 395, [84 S.Ct. 452, 11 L.Ed.2d 411] on authority of Kolovrat v. Oregon, 366 U.S. 187. [81 S.Ct. 922, 6 L.Ed.2d 218.]

"And further:

'* * * Yugoslavia, as the court below found is a satellite state where the residents have no individualistic control over their destiny, fate or pocketbooks, and where their politico-economic horizon is raised or lowered according to the will, wish or whim of a self-made dictator.' 411 Pa., at 509, 192 A.2d, at 742.

'All the known facts of a Sovietized state lead to the irresistible conclusion that sending American money to a person within the borders of an Iron Curtain country is like sending a basket of food to Little Red Ridinghood in care of her "grandmother". It could be that greedy, gluttonous grasp of the government collector in Yugoslavia does not clutch as rapaciously as his brother confiscators in Russia, but it is abundantly clear that there is no assurance upon which an American court can depend that a named Yugoslavian individual beneficiary of American dollars will have anything left to shelter, clothe and feed himself once he has paid financial involuntary tribute to the tyranny of a totalitarian regime.' Id., at 511, 192 A.2d, at 742–743.

"Another example is a concurring opinion by Justice Doyle in In re Hosova's Estate, 143 Mont. 74, 387 P.2d 305:

'In this year of 1963, the Central Committee of the Communist Party of the U.S.S.R. issued the following directive to all of its member[s], "We fully stand for the destruction of imperialism and capitalism. We not only believe in the inevitable destruction of capitalism, but also are doing everything for this to be accomplished by way of the class struggle, and *as soon as possible*.'

'Hence, in affirming this decision the writer is knowingly contributing financial aid to a Communist monolithic satellite, fanatically dedicated to the abolishing of the freedom and liberty of the citizens of this nation.

'By reason of self-hypnosis and failure to understand the aims and objective of the international Communist conspiracy, in the year 1946, Montana did not have statutes to estop us from making cash contributions to our own ultimate destruction as a free nation.' Id., at 85–86, 387 P.2d, at 311."

stated: " * * * The statute as construed seems to make unavoidable judicial criticism of nations established on a more authorization basis than our own." 389 U.S. at 440, 88 S.Ct. at 670.

Justice Stewart and Justice Brennan in a concurring opinion stated that although they joined with the majority they would go even further and hold the Oregon statute unconstitutional on its face.

Justice Stewart said that in his view,

" * * * each of the three provisions of the Oregon law suffers from the same fatal infirmity. All three launch the State upon a prohibited voyage into a domain of exclusively federal competence. Any realistic attempts to apply any of the three criteria would necessarily involve the Oregon courts in an *evaluation,* either expressed or implied, of the administration of foreign law, the credibility of foreign diplomatic statements, and the policies of foreign governments." 389 U.S. at 442. [Emphasis own].

Justice Harlan also concurred in a separate opinion in which he felt the Oregon statute was constitutional but could not be applied against Germany because of a 1923 Treaty [11] between that country and the United States. Justice Harlan's interpretation of the majority opinion in *Zschernig* was as follows:

"Essentially, the Court's basis for decision appears to be that alien laws afford state court judges an opportunity to criticize in dictum the policies of foreign governments, and that these dicta may adversely affect our foreign relations." 389 U.S. at 461, 88 S.Ct. at 681.

The *Zschernig* decision was also thoroughly, and we believe correctly analyzed by a three judge panel of the United States District Court for the Southern District of New York in Goldstein v. Cox, 299 F. Supp. 1389 [S.D.N.Y. 1968]. The Court held that the fact that two New York surrogates directed that the distributive shares in a New York estate to certain non-resident aliens to be deposited in court pursuant to a New York statute [12] authorizing the withhold-

11. Article IV of the 1923 Treaty of Friendship, Commerce and Consular Rights with Germany [44 Stat. 2135] provides:

"Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference, and exempt from any succession, probate or administrative duties or charges other than those which may be imposed in like cases upon the nationals of the country from which such proceeds may be drawn.

"Nationals of either High Contracting Party may have full ·power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure subject to the payment of such duties or charges only as the nationals of the High Contracting Party within those territories such property may be or belong shall be liable to pay in like cases."

12. Section 2218 [Supp.1969], formerly § 269–a of New York Surrogate's Court Act, reads as follows:

"1. [a] Where it shall appear that an alien legatee, distributee or beneficiary is domiciled or resident within a country to which checks or warrants drawn against funds of the United States may not be transmitted by reason of any executive order, regulation or similar determination of the United States government or any department or agency thereof, the court shall direct

ing of payment of any money or property to alien distributees, whenever it appears they would not have the benefit or use thereof, did not justify a finding that the statute was unconstitutional, because there was no showing that it had been applied in such a way as to interfere with foreign relations.

The *Goldstein* Court's interpretation of *Zschernig,* is the same as ours. That Court in upholding the New York statute stated as follows:

> "In the case before us there is no showing that the New York courts have engaged in the conduct criticized in *Zschernig.* There is no showing and not even any claim that the New York courts have uttered any animadversions * * *." 299 F.Supp. 1393.

It is clear, then, that the *Goldstein* Court, like Justice Stewart, Justice Brennan and Justice Harlan, interpreted the

majority opinion in *Zschernig* as a holding aimed at ending judicial criticism of foreign governments.

*Zschernig's* application to the New York statute has been considered by a New York state court In Matter of Leikind, 22 N.Y.2d 346, 292 N.Y.S.2d 681, 239 N.E.2d 550 [1968].[13] There the New York Court of Appeals interpreted *Zschernig* as a decision dealing with the unconstitutional application of the escheat statute by the Oregon courts. The Court of Appeals upheld the New York escheat statute on the grounds that the New York lower courts had not engaged in the type of conduct criticized in *Zschernig.*

In the recent decision of Bjarsch v. DiFalco, 314 F. Supp. 127 [S.D.N.Y. 1970], a three judge district court, in an opinion by Judge Palmieri, held that an amendment to the New York Surrogate's Court Procedure Act[14] was

that the money or property to which such alien would otherwise be entitled shall be paid into court for the benefit of said alien or the person or persons who thereafter may appear to be entitled thereto. The money or property so paid into court shall be paid out only upon order of the surrogate or pursuant to the order or judgment of a court of competent jurisdiction.

"[b] Any assignment of a fund which is required to be deposited pursuant to the provisions of paragraph one [a] of this section shall not be effective to confer upon the assignee any greater right to the delivery of the fund than the assignor would otherwise enjoy.

"2. Where it shall appear that a beneficiary would *not* have the benefit or use or control of the money or other property due him or where other special circumstances make it desirable that such payment should be withheld the decree may direct that such money or property be paid into court for the benefit of the beneficiary or the person or persons who may thereafter appear entitled thereto. The money or property so paid into court shall be paid out only upon order of the court or pursuant to the order or judgment of a court of competent jurisdiction.

"3. In any such proceeding where it is uncertain that an alien beneficiary or fiduciary not residing within the United States, the District of Columbia, the

Commonwealth of Puerto Rico or a territory or possession of the United States would have the benefit or use or control of the money or property due him the burden of proving that the alien beneficiary will receive the benefit or use or control of the money or property due him shall be upon him or the person claiming from, through or under him."

13. The New York court considered the same statute as did the Federal Court in *Goldstein. See,* Note 10, *supra.*

14. Section 2218, New York Surrogate's Court Procedure Act, now reads as follows:

"Sec. 2218. Deposit in court for benefit of legatee, distributee or beneficiary.

1. [a] Where it shall appear that an alien legatee, distributee or beneficiary is domiciled or resident within a country to which checks or warrants drawn against funds of the United States may not be transmitted by reason of any executive order, regulation or similar determination of the United States government or any department or agency thereof, the court shall direct that the money or property to which such alien would otherwise be entitled shall be paid into court for the benefit of said alien or the person or persons who thereafter may appear to be entitled thereto. The money or property so paid into court shall be paid only upon order of the surrogate or pursuant to the order or

not unconstitutional under the *Zschernig* rationale.

The section under consideration in *DiFalco* was a "benefit, use and control provision relating to the right of alien legatees and beneficiaries to receive funds from the estates of New York decedents." The section allows the Surrogate to order that money or property due an alien beneficiary to be paid into court, whenever it appears that the proposed recipient would not have the benefit, use or control of the money or property.

In upholding the statute, the Court commented on the *Clark* and *Zschernig* decisions, saying:

"The *Clark* and *Zschernig* decisions together can be construed to mean that statutes restricting the rights of alien beneficiaries to receive inheritances of United States citizens do not inherently constitute an intrusion into the foreign affairs area. At the same time, in applying such statutes, whether the law be a reciprocity provision or a benefit, use and control provision, they appear to warn the state courts not to inquire into or evaluate the administration of foreign law, or the

credibility and policies of foreign governments. Thus a court is limited to a 'routine reading' of a foreign country's laws or a 'just matching' of such laws with the laws of the state involved. * * * " 314 F.Supp. at 133.

That Court then was in accord with all the reported authority, in its interpretation of *Zschernig*.

The case of Mora v. Battin, 303 F. Supp. 660 (N.D. Ohio 1969), analyzed *Zschernig* in considering the constitutionality of the Ohio "Iron Curtain" statute. The court said:

"* * * where a statute permits inquiry into the type of government existing in a foreign nation, or into the operation of that government, or into the question of whether the legal 'rights' guaranteed by that nation are rights in fact, or into the question of whether statements by the representatives of the foreign nation are credible or made in good faith, or into the likelihood that the legatees will actually receive the property left to them, such a statute, so applied, intrudes into the exclusive right of Congress to regulate foreign policy."[15] 303 F.Supp.at 664.

---

judgment of a court of competent jurisdiction.

"[b] Any assignment of a fund which is required to be deposited pursuant to the provisions of paragraph one [a] of this section shall not be effective to confer upon the assignee any greater right to the delivery of the fund than the assignor would otherwise enjoy.

"2. Where it shall appear that a beneficiary would not have the benefit or use or control of the money or other property due him or where other special circumstances make it desirable that such payment should be withheld the decree may direct that such money or property be paid into court for the benefit of the beneficiary or the person or persons who may thereafter appear entitled thereto. The money or property so paid into court shall be paid out only upon order of the court of competent jurisdiction.

"3. In any such proceeding where it is uncertain that an alien beneficiary or fiduciary not residing within the United States, the District of Columbia, the

Commonwealth of Puerto Rico or a territory or possession of the United States would have the benefit or use or control of the money or property due him shall be upon him or the person claiming from, through or under him."

15. In the *Mora* case the court had before it the so-called Ohio "Iron Curtain" statute. In light of *Zschernig* the statute was declared unconstitutional. The provision was similar to the Oregon statute struck down in *Zschernig*.

Section 2113.81, Ohio Revised Code, provided as follows:

"Where it appears that a legatee or a distributee, or a beneficiary of a trust not residing within the United States or its territories will not have the benefit or use or control of the money or other property due him from an estate, because of circumstances prevailing at the place of residence of such legatee, distributee, or a beneficiary of a trust, the probate court may direct that such money be paid into the county treasury to be held in trust or the probate court

It is thus apparent that every court which has considered *Zschernig*, has interpreted it to mean that judicial criticism of foreign governments is constitutionally impermissible, and the decision extends no further than that, at the present time.

A careful reading of the entire *Zschernig* opinion and cases decided pursuant to that decision as cited herein, convinces this panel that the sole basis for striking down the Oregon escheat statute was the manner in which the said statute was being applied. Also, it is apparent that every court which has considered *Zschernig* has interpreted it to mean no more than that judicial criticism of foreign governments is constitutionally impermissible. It is obvious to this Court that the Nebraska statutes challenged herein, are not being applied by the Nebraska Courts in such a way as to come within the prohibitions of the *Zschernig* case.

The Nebraska statutes in question leave no room for judicial comment of any kind about foreign governments. They simply provide that no non-resident alien can inherit Nebraska land which is outside of a three mile limit from the corporate limits of any city or town. Such an absolute limitation does not allow for discrimination among foreign nations on any basis. Justice Harlan in his concurring opinion in *Zschernig* noted that a statute such as Nebraska has, is distinguishable from a statute such as the Oregon statute involved therein. The Justice said: "[T]he appellants concede that Oregon might deny inheritance rights to all nonresident aliens." This is exactly what the Nebraska statute does—it denies the right to inherit certain Nebraska lands uniformly to all non-resident aliens.

Contrary to plaintiff's contention that the Nebraska statute is an interference with the foreign relations of the United States as pointed out on page 6 the state courts have instead always deferred to United States foreign relations and have followed foreign policy whenever the federal government has expressed it in a treaty.

Our analysis of the *Zschernig* decision, our reading and examination of the Nebraska statutes challenged herein and the history of those statutes as reported in the decision of Nebraska courts compels us to conclude that the Nebraska statutes are not unconstitutional on any basis set forth in *Zschernig*. While it is true that the Nebraska statutes may have an incidental or indirect effect on the relations of the United States and foreign nations, the same was true of the California statute considered by the United States Supreme Court in the Clark v. Allen case, which the Court upheld, and continued to approve in *Zschernig*.

In finding that the *Zschernig* rationale does not extend so far as to invalidate statutes such as those here under consideration, we adopt the concluding language of Goldstein v. Cox, 299 F. Supp. at 1394, where it was said:

"We appreciate that the Supreme Court may eventually go further than it has thus far gone * * * But we conceive it to be our duty to enforce the law as it is, and not as it may be in the future."

Do the Nebraska Statutes Deprive Nonresident Aliens or the Decedent Herein of Property in Violation of the Due Process and Equal Protection Claus-

---

may direct that such money or other property be delivered to a trustee which trustee shall have the same powers and duties provided in section 2119.03 of the Revised Code for such legatee, distributee, beneficiary of a trust or such persons who may thereafter be entitled thereto. Such money or other property

held in trust by such county treasurer or trustee shall be paid out by order of the probate judge in accordance with section 2113.82 of the Revised Code. The county treasury shall not be liable for interest on such money held in trust."

es of the Fourteenth Amendment to the United States Constitution?

Plaintiffs contend that the Nebraska statutes herein challenged, deprive them and other nonresident aliens of their property without due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution. They also assert that when the challenged statutes are read in conjunction with Section 76–414, R.R.S.1943,[16] they are denied equal protection of the law as guaranteed by the equal protection clause of the Fourteenth Amendment of the United States Constitution.

Plaintiffs' contentions in this regard are without merit.

The Fourteenth Amendment to the United States Constitution provides: "No state shall * * * deny to any person within its jurisdiction the equal protection of its laws." Thus before a state must accord Fourteenth Amendment Equal Protection Rights to any person, that person must be physically present within its borders. Therefore, while aliens residing within a state are clearly entitled to the equal protection of its laws, the same is not true of nonresident aliens, and a state is not constitutionally required to accord the equal protection of its laws to this latter group of aliens.[17] Accordingly, this Court concludes that the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution has no application to the nonresident alien plaintiffs appearing in this case.

The due process clause of the Fourteenth Amendment presents a somewhat different situation in that it reads: "[N]o State shall * * * deprive any person of life, liberty, or property, without due process of law * * *." This clause would indicate that even nonresident aliens are perhaps entitled to due process, because it applies to all persons, with no requirement that they be within the jurisdiction of the State.

The Supreme Court has never indicated in unequivocal terms whether a State is required to give due process to nonresident aliens.[18] However, as this Court is of the opinion that Section 76–402 R.R.S.1943 [Reissue of 1966] does not deprive nonresident aliens of property without due process of law, as required by the Fourteenth Amendment to the United States Constitution we need not decide whether or not a State must accord nonresident aliens due process.

In the case of Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 [1923], the Supreme Court of the United States upheld a Washington statute, which was a much more restrictive land statute than the one involved in the present case. The statute had been challenged as a violation of the due process and equal protection clauses of the Fourteenth Amendment as applied to aliens who, under the naturalization laws of

16. Which statute, as noted before, excepts property within three miles of the corporate limits of any city or town from the operation of the challenged statutes. *See* Note 6 *supra.*

17. See Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 [1888]; Wormsen v. Moss, 177 Misc. 19, 29 N.Y.S.2d 798 [1941]; Templar v. Michigan State Board of Examiners, 131 Mich. 254, 90 N.W. 1058 [1902]; Torao Takahaski v. Fish & Game Commission, 30 Cal.2d 719, 185 P.2d 805, rev'd on other grounds 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 [1947]. *See also* River Vale Tp. v. Town of Orangetown, 403 F.2d 684 [2d Cir. 1968]; Cermeno-Cerna v. Farrell, 291 F.Supp. 521 [C.D.Cal.1968].

18. In regard to the question of whether or not nonresident aliens are entitled to due process, see Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 [1953]; Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 [1945]; Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 [1950]; Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 [1954]; Cermeno-Cerna v. Farrell, 291 F.Supp. 521 [C.D.Cal.1968] But *cf.* Sardino v. Federal Reserve Bank of New York, 361 F.2d 106 [2d Cir. 1966].

Congress, are ineligible to citizenship. The Act provided in substance that any alien could not own, take, have or hold the legal or equitable title, or right to any benefit of any land as defined in the Act, and that land conveyed to or for the use of aliens in violation of the state constitution or of the act shall thereby be forfeited to the State. And it was made a gross misdemeanor, punishable by fine or imprisonment or both, knowingly to transfer land or the right to the control, possession or use of land to such an alien.

The Court held that the challenged statute was a valid exercise of the state's police power and that such " * * * legislation applying alike and equally to all aliens, withholding from them the right to own land, cannot be said to be capricious or to amount to an arbitrary deprivation of liberty or property, or to transgress the due process clause." 263 U.S. at 218, 44 S.Ct. at 19. The Court also held, "[T]he state act is not repugnant to the equal protection clause and does not contravene the Fourteenth Amendment."

Within a week of the *Terrace* decision, the Supreme Court, on the basis of *Terrace*, upheld California's Alien Land Laws against due process and equal protection challenge under the Fourteenth Amendment. See Porterfield v. Webb, 263 U.S. 225, 44 S.Ct. 21, 68 L.Ed. 278 [1923]; Webb v. O'Brien, 263 U.S. 313, 44 S.Ct. 112, 68 L.Ed. 318 [1923] and Frick v. Webb, 263 U.S. 326, 44 S.Ct. 115, 68 L.Ed. 323 [1923].

In the case of Sei Fujii v. State, 38 Cal.2d 718, 242 P.2d 617 [1952], the Supreme Court of California invalidated the statute upheld in the *Porterfield*, *O'Brien*, and *Frick* cases, *supra*, reasoning that those cases were no longer the law, because of the United States Supreme Court decision in the case of Oyama v. State of California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 [1948].

In *Sei Fujii* the court in reference to the due process arguments presented in *Terrace* stated:

"Moreover, if as indicated in the Terrace case, 263 U.S. at pages 217–221, 44 S.Ct. at pages 18–20, 68 L.Ed. 255, a state may properly bar all non-citizens from owning land, the method of classification here involved was not designed to bring about that result." 242 P.2d at page 628.

The *Sei Fujii* Court, in reaching the decision that *Porterfield* was no longer valid, stated:

"Moreover, under the Porterfield rule, ineligible aliens who are not protected by treaty may be restricted in following many ordinary occupations other than farming, since it is reasonably necessary to the operation of most private businesses to own or lease land upon which an office, shop or factory may be located. Legislation which results in such discrimination imposes upon the ineligible alien an economic status inferior to that of all other persons living in the state and interferes with his right to earn a living. See Kenji Namba v. McCourt, 185 Or. 579, 204 P.2d 569, 583; concurring opinion, Palmero v. Stockton Theatres, Inc., 32 Cal.2d 53, 66–67, 195 P.2d 1." 242 P.2d at page 629.

That Court concluded at page 630 that:

" * * * the constitutional theories upon which the Porterfield case was based are today without support and must be abandoned. The California alien land law is obviously designed and administered as an instrument for effectuating racial discrimination, and the most searching examination discloses no circumstances justifying classification on that basis. There is nothing to indicate that those *alien residents* who are racially ineligible for citizenship possess characteristics which are dangerous to the legitimate interests of the state, or that they, as a class, might use the land for purposes injurious to public morals, safety or welfare. Accordingly, we hold that the alien land law is invalid as in violation of the Fourteenth Amendment."

Thus *Sei Fujii* did not consider the validity of the due process arguments presented in *Terrace*.

As a basis for considering *Terrace* of questioned validity, *Sei Fujii* made reference to the concurring opinions in *Oyama*. However, the attack made in the concurring opinions in *Oyama*, upon *Terrace* was again only in regard to the validity of the Equal Protection arguments set forth in *Terrace*.

In *Oyama* the United States Supreme Court held that a presumption declared by section nine of the California Alien Land Law [19] violated the right of citizens who were children of ineligible aliens and discriminated against such citizens solely because of their parents' ancestry. The court rejected an argument that the presumption was necessary to prevent evasion of the prohibition against ownership of land by ineligible aliens.

The majority opinion in *Oyama* did not consider the due process arguments therein raised. The court stated:

"Since the view we take of petitioner's first contention requires reversal of the decision below, we do not reach their other contentions: that the Alien Land Law denies ineligible aliens the equal protection of the laws, and that

failure to apply any limitation period to escheat actions under that law takes property without due process of law."

Four Justices concurred in the result on the broad ground that the basic provision of the alien land law violated the Fourteenth Amendment, stating that previous decision upholding the statute should be overruled. However, the concurring opinions in *Oyama* questioned the validity of *Terrace*, only in regard to The Fourteenth Amendment Equal Protection Right therein expressed.[20]

This Court is therefore of the opinion that a state's absolute bar of ownership of land by nonresident aliens has been held by the Supreme Court to be within the valid exercise of that state's police power, and not violative of due process of law under the Fourteenth Amendment.[21]

Plaintiffs also argue that the statutes in question deprive the decedent of his right to dispose of his property as he sees fit. They contend that this is a denial of liberty without due process of law and is therefore violative of the due process clause of the Fourteenth Amendment of the United States Constitution. Plaintiff lacks standing to assert the decedent's rights. It is true that plaintiffs are suffering an injury, insofar

19. That section provided for a prima facie presumption of intent to evade escheat upon proof that the consideration for a conveyance of realty was paid or agreed to be paid by an ineligible alien and that title was taken in the name of a citizen or eligible alien.

20. In Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948) the concurring opinion of Justice Black is found at page 647, 68 S.Ct. 269 and the concurring opinion of Justice Murphy is found at page 650, 68 S.Ct. 269. Justice Douglas concurred with Justice Black and Justice Rutledge concurred with Justice Murphy.

21. In regard to plaintiff's argument, that they are denied Fourteenth Amendment rights, by the challenged statute, it should be noted that the same argument was made in the case of Toop v. Ulysses Land

Company, 237 U.S. 580, 35 S.Ct. 739, 59 L.Ed. 1127 [1915]. In that case the United States Supreme Court in considering the predecessor statute to Sec. 76-402, R.R.S.1943 [Reissue of 1966] [i. e., act of March 16, 1889, Section 4825, Comp.Stat. of 1907] did not consider the due process arguments substantial enough to discuss. In reviewing that statute which also prohibited nonresident aliens "from acquiring title to or taking or holding any lands or real estate in this state by descent, devise, purchase, or otherwise," etc., the court said:
"* * * [A] contention that the state statute forbidding ownership of real property by aliens was repugnant to the Fourteenth Amendment. * * * we think * * * is too frivolous to afford a basis for jurisdiction * * * to prosecute this direct writ of error * * *."

as the statute prevents them from inheriting Nebraska realty. However, even where one has a right of the sort requisite to give him standing to sue, the settled rule is that he may not assert the rights of some other person. Such was the case in Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 [1943], holding that a physician seeking a declaratory judgment that a statute preventing him from giving advice as to contraceptives was unconstitutional, could not rely on his patients' rights to life, which the statute supposedly threatened. It is true that the Tileston rule is a rule of practice only and should be disregarded when the reasons which underlie it are outweighed by sufficient countervailing considerations. See Barrows v. Jackson, 346 U.S. 841, 74 S.Ct. 19, 98 L.Ed. 361 (1953). There are, however, no peculiar circumstances in this case which compel us to disregard the *Tileston* Rule, and we find that rule directly applicable to our situation. The plaintiffs simply lack standing to raise the decedent's rights.

Accordingly,

It is our conclusion, after a thorough and exhaustive research of the applicable law, that the statutes which the plaintiffs herein challenge cannot be held unconstitutional on any of the grounds put forth in plaintiffs' argument.

Pursuant to this opinion an Order will be entered by this Court pursuant to 28 U.S.C. § 1253 [22] sustaining defendant's Motion to Dismiss and denying plaintiffs the injunctive relief they ask for.

LAY, Circuit Judge (concurring).

I concur in the dismissal of the petitioner's complaint. However, I do so within the confines of the sole issue raised within the pleadings, that is, whether the Nebraska statutes §§ 76–401 and 76–402 (R.R.S.1943), constitute an "impermissible interference with federal power

over foreign affairs." This attack is made on the averment that such statutes violate Art. I, §§ 8 and 10 of the United States Constitution. As Chief Judge Robinson has succinctly discussed, this assertion is without merit. I do not find it necessary to pass on the issues of due process or equal protection under the Fourteenth Amendment since they are not within the pleadings before us. For this same reason, I do not find it necessary to consider abstention or to contemplate whether Nebraska statutes may be interpreted to compensate the plaintiff for the land deemed escheated.

VAN PELT, Senior District Judge (dissenting):

It is with regret that I conclude that I cannot join in the opinion adopted by my esteemed colleagues in this case. It is my conclusion that in reaching the proper decision in this controversy we should await the action of the state courts and a final decision in the Supreme Court of the State of Nebraska as to Section 76–402 of the Nebraska Revised Statutes. I cannot agree that under the guise of police power a state may discriminate against non-resident aliens of countries with whom we are not at war, and deny them due process as required by the Fourteenth Amendment. If the Nebraska court, in the pending state court litigation, would hold that a non-resident alien is entitled to compensation for the property which escheats to the state then he has had due process under the Fourteenth Amendment. If the statute is so interpreted as to escheat his property without compensation then I think the statute unconstitutional. My reasons cannot be set forth as briefly as I had hoped.

### ABSTENTION

In Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), the

---

22. See Goldstein v. Cox, 396 U.S. 471, 90 S.Ct. 671, 24 L.Ed.2d 663 (1968), where the Supreme Court held that the District Court must either order an injunction or expressly deny it under 28 U.S.C. § 1253, before the Supreme Court can obtain jurisdiction of the case on appeal.

Court discussed the rules pertaining to the judicially created doctrine of abstention, first laid down by the Court in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Reetz*, the Court said:

> "[The abstention doctrine] should be applied only where 'the issue of state law is uncertain.' Harman v. Forssenius, 380 U.S. 528, 534 [85 S.Ct. 1177, 14 L.Ed.2d 50]. Moreover, we said in Zwickler v. Koota, 389 U.S. 241, 248, [88 S.Ct. 391, 19 L.Ed.2d 444] that abstention was applicable 'only in narrowly limited "special circumstances,"' citing Propper v. Clark, 337 U.S. 472, 492 [69 S.Ct. 1333, 93 L.Ed. 1480]. In *Zwickler*, a state statute was attacked on the ground that on its face it was repugnant to the First Amendment; and it was conceded that state court construction could not render unnecessary a decision of the First Amendment question. 389 U.S., at 520 [88 S.Ct., at 396]. A state court decision here, however, could conceivably avoid any decision under the Fourteenth Amendment, and would avoid any possible irritant in the federal-state relationship."

I consider the abstention doctrine applicable in this case, for as I read the Nebraska cases the state supreme court has never passed on the question of whether a non-resident alien is entitled to compensation. I would, therefore, afford the Nebraska courts the opportunity to pass upon the state statutes here involved. It is not unlikely that this controversy could thus end in the state courts without our interference.

Even assuming the abstention doctrine is not applicable, I would dissent from the proposed disposition of this case, and reject the holding in Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923). In my view that case was wrongly decided and should not control the outcome of this controversy. While I agree that the police power of the state is an important constitutional grant, and is not diminished in stature or importance by the Fourteenth Amendment, I cannot agree that a state may discriminate against aliens and deny them due process, as required by the Fourteenth Amendment, under the guise of the police power. The focal point of my differences with the proposed opinion is Neb.Rev.Stat. § 76–402 (Reissue 1966).[1]

To me there are three issues in this case which are inextricably bound together and to which there are no clearcut answers. Perhaps the primary issue to be decided is whether a non-resident alien has standing to raise the argument that he has been deprived of his property located in this country without due process of law. Secondly, assuming he does have such standing, does the alien in fact have any "property" which has been taken by the state. Finally, assuming the alien has both standing and property, is the statute consistent with the Fourteenth Amendment on the basis that the statutory scheme provides compensation to those persons who would have been entitled to the property save for the operation of § 76–402?

## STANDING

The issue of whether a non-resident alien has standing to raise the due process argument, if he is physically absent from this country but allegedly has property here which provides a basis for jurisdiction is not considered by the proposed opinion. Instead the opinion concludes that the statutes in question do not violate the due process clause in any event. The former issue has never been

---

1. "Aliens and corporations not incorporated under the laws of the State of Nebraska are prohibited from acquiring title to or taking or holding any land, or real estate, or any leasehold interest extending for a period for more than five years or any other greater interest less than fee in any land, or real estate in this state by descent, devise, purchase or otherwise, except as provided in sections 76–403 to 76–405."

decided by the United States Supreme Court,[2] although there have been lower court pronouncements on this issue. *See, e. g.,* Cermeno-Cerna v. Farrell, 291 F. Supp. 521 (C.D.Cal.1968); *contra,* Sardino v. Federal Reserve Bank of New York, 361 F.2d 106 (2nd Cir. 1966).

Perusal of the language contained in the Fourteenth Amendment reveals that there is an obvious distinction between the class of persons protected by the due process clause and the class of persons protected by the equal protection clause of that amendment, as the proposed opinion has pointed out. The equal protection clause extends its protection only to those persons within the jurisdiction of the state, but there is no comparable limitation in the language of the due process clause. *See* Township of River Vale v. Town of Orangetown, 403 F.2d 684 (2nd Cir. 1968). As I read the due process clause, it applies to *any person,* regardless of whether that person resides within the territorial jurisdiction of the United States, if that person can show some deprivation of life, liberty, or property within the territorial jurisdiction sufficient to give the judiciary power to act. No words of qualification or limitation appear. I submit that, for purposes of standing, there is no logical basis for asserting that the words do not mean precisely what they say, and therefore a non-resident, friendly alien alleging a deprivation of his property which is located within the territorial boundaries of this country would have standing to raise the due process argument.

In Cermeno-Cerna v. Farrell, *supra,* deportation proceedings were instituted against certain "commuter" aliens, pursuant to 8 C.F.R. § 211.1(b). Plaintiffs filed a declaratory judgment action to have the regulation declared invalid on the ground that it violated the Fourteenth Amendment. The regulation, in essence, prohibited these "commuter" aliens who entered the country on special entry forms, from returning to the United States if, prior to their departure or during their absence, the alien arranged to return for the purpose of accepting employment at a place where the Secretary of Labor had determined that a labor dispute existed. The court, in holding that the regulation did not call for court intervention, stated:

"The regulation thus classifies returning immigrants as:

1. Those returning to employers not certified by the Secretary of Labor who can use their I–151 green card for entry; and

2. Those returning to employers certified by the Secretary of Labor who cannot use their I–151 green card for entry.

"Certainly, without more, such a distinction is arbitrary and without rational basis when applied to immigrants admitted for permanent residence to the United States who are exercising a privilege to travel to and from their native land to their adopted one. Such a distinction cannot stand within the rationale of Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *Recognizing that aliens outside the United States cannot complain of a lack of due process or equal protection of the law, it is*

---

**2.** There have been numerous statements by the Court, however, in other contexts which ultimately conclude that the Bill of Rights is properly extended to resident aliens who are physically present in this country. *See, e. g.,* Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953); Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952); Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255

(1950); Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915). In Johnson v. Eisentrager, *supra,* the Court stated that "it was the alien's presence within [the state's] territorial jurisdiction that gave the Judiciary power to act." *Id.* 339 U.S. at 771, 70 S.Ct. at 940. The Court has never considered whether an *in rem* basis of jurisdiction would similarly suffice to give the Judiciary power to act.

*clear that aliens residing or present within the United States must be afforded both procedural and substantive due process and equal protection.* Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954)." *Id.* 291 F.Supp. at 528 (emphasis added).

The court cites Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), for the proposition that residing in this country entitles an alien to invoke the protection of the due process and equal protection clauses. That case cannot, however, be cited for the proposition that residing outside the territorial boundaries prohibits an alien from invoking the protection of the due process clause when the alien has allegedly been deprived of his property located within the boundaries of this country. With all due respect, I feel constrained to reject the proposition that aliens outside of the United States are not entitled to the protection of the due process clause if they have property in this country. The very words of the Fourteenth Amendment refute such a conclusion. Judge Friendly has perhaps expressed this view most succinctly:

"The Government's second answer that 'The Constitution of the United States confers no rights on non-resident aliens' is so patently erroneous *in a case involving property in the United States* that we are surprised it was made. Throughout our history the guarantees of the Constitution have been considered applicable to all actions of the Government within our borders—and even to some without. Cf. Reid v. Covert, 354 U.S. 1, 5, 8, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). * * * This country's present economic position is due in no small part to European investors who placed their funds at risk in its development, rightly believing they were protected by constitutional guarantees; today, for other reasons, we are still eager to attract foreign funds. In Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 491–492, 51 S.Ct. 229, 75

L.Ed. 473 (1931), the Court squarely held that an alien friend is entitled to the protection of the Fifth Amendment's prohibition of taking without just compensation—even when his government was no longer recognized by this country. And the Court has declared unequivocally, with respect to non-resident aliens owning property within the United States, that they 'as well as citizens are entitled to the protection of the Fifth Amendment.' United States v. Pink, 315 U.S. 203, 228, 62 S.Ct. 552, 564, 86 L.Ed. 796 (1942). See also Guessefeldt v. McGrath, 342 U.S. 308, 317–319, 72 S.Ct. 338, 96 L.Ed. 342 (1952).

"It does not follow, however, that in dealing with the property of an alien the United States must be blind to the acts of the, country of which he is a national; the Constitution protects the alien from arbitrary action by our government but not from reasonable response to such action by his own."

Sardino v. Federal Reserve Bank of New York, 361 F.2d 106, 111 (2nd Cir. 1966) (footnote omitted) (emphasis added).

The argument that *Sardino* is readily distinguishable from the instant case has merit. In *Sardino,* a Cuban national challenged regulations issued by the Secretary of Treasury freezing all bank deposits of such individuals. The court upheld the regulations on the ground that it was a legitimate means of withholding dollar resources from a government engaged in activities inimical to our national welfare, and to compensate our citizens for wrongs done by that government. The "property" involved in that case, however, consisted of currency actually owned by the non-resident alien. Here, on the other hand, the "property" in question is not currency, but real estate. In *Sardino* there was no question as to the ownership of the money, but in this case there is a question as to the ownership of the real estate.

This then brings me to the second issue connected with this case, that is, whether the non-resident alien had any

"property" which was in fact taken by the state. Obviously the due process clause would be of little consequence if he did not.

Arguably, the alien has no "property" in this state because the land escheats automatically to the state upon the failure of heirs, under Neb.Rev.Stat. § 76-401 (Reissue 1966),[3] and there is a "failure of heirs" due to the operation of § 76-402 here under attack. An analogy may be drawn to a situation in which an alien is attempting to gain entrance into this country, so the argument runs, and as such he does not have any constitutional rights. See Kwong Hai Chew v. Colding, 344 U.S. 590, 596–597, n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953). However, to say that the non-resident alien has no property presupposes the constitutional validity of the very statutes here under attack. It is the statutory operation of Neb.Rev.Stat. § 76-402 (Reissue 1966) which precludes the non-resident alien in this case from actually taking the property in his name and establishing title to it.

While I recognize the general presumption that a legislative enactment is constitutional, see, e. g., United States v. Powers, 307 U.S. 214, 59 S.Ct. 805, 83 L.Ed. 1245 (1939), rehearing denied, 308 U.S. 631, 60 S.Ct. 66, 84 L.Ed. 526 (1939). I fail to understand how that presumption can be raised as an impenetrable shield to foreclose an attack on constitutional grounds. To do so, it seems to me, forces the proponent of such an argument to advocate or engage in circuitous reasoning, and force everyone else into a game of semantics. The result is that the statute is left unscathed on the sole ground that the legislature presumably acted within constitutional limits, without ever having examined whether it did so in fact.

I am fully cognizant of the rule at common law that an alien was not entitled to hold real property in his own name. See, e. g., Fairfax's Devisee v. Hunter's Lessee, 11 U.S. (7 Cr.) 603, 3 L.Ed. 453 (1813). He could take by act of the parties, but could not take by operation of law. At the same time I am aware that our Constitution is based on a considerable extent upon the common law. Nevertheless, I cannot discount the precise language of the due process clause and its logic. It commands with unmistakable clarity that no state shall deny *any person* the right to due process of law. The right is not limited solely to citizens or residents. Physical location or presence is not designated a ground for distinguishing between those who are entitled to its protection and those who are not, when there is some basis upon which the judiciary may act.

This is not to say, however, that non-resident aliens are given *carte blanche* under the Fourteenth Amendment. Although "the alien in several respects stands on an equal footing with citizens, * * * in others [he] has never been conceded legal parity with the citizen." Harisiades v. Shaughnessy, 342 U.S. 580, 586, 72 S.Ct. 512, 517, 96 L.Ed. 586 (1952).

" 'The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens. They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.' " Kwong Hai Chew v. Colding, 344 U.S. 590, 596–597, n. 5, 73

---

3. "Upon the failure of heirs, the title shall vest at once in the state, without an inquest or other proceedings in the nature of office found."

S.Ct. 472, 477, 97 L.Ed. 576 (1953), citing, Bridges v. Wixon, 326 U.S. 135, 161, 65 S.Ct. 1443, 89 L.Ed. 2103 (concurring opinion).

The Court has been careful to explicate some of the limitations which must be observed in connection with aliens.

"[T]he Constitution assures [the alien] a large measure of equal economic opportunity, Yick Wo v. Hopkins, 118 U.S. 356, [6 S.Ct. 1064, 30 L.Ed. 220]; Truax v. Raich, 239 U.S. 33, [36 S.Ct. 7, 60 L.Ed. 131]; he may invoke the writ of habeas corpus to protect his personal liberty, Nishimura Ekiu v. United States, 142 U.S. 651, 660, [12 S.Ct. 336, 35 L.Ed. 1146] in criminal proceedings against him he must be accorded the protections of the Fifth and Sixth Amendments, Wong Wing v. United States, 163 U.S. 228, [16 S.Ct. 977, 41 L.Ed. 140]; and, unless he is an enemy alien, his property cannot be taken without just compensation. Russian Volunteer Fleet v. United States, 282 U.S. 481 [51 S.Ct. 229, 75 L.Ed. 473]." Harisiades v. Shaughnessy, *supra,* 342 U.S. at 586, n. 9, 72 S.Ct. at 517.

Most cases in which aliens are involved afford as a basis for jurisdiction the alien's physical presence within the state's boundaries, "and [in those cases] the civil and property rights of immigrants or transients of foreign nationality so nearly approach equivalence to those of citizens," there is little need to inquire whether the individual is citizen or alien. Johnson v. Eisentrager, 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950). The courts have further recognized the power of the government to terminate the hospitality extended to aliens, and to distinguish between those declared friendly and those declared enemy aliens. "War, of course, is the most usual occasion for extensive resort to [this] power." Harisiades v. Shaughnessy, supra, 342 U.S. at 587, 70 S.Ct. at 517.

Nothing in this record indicates that plaintiffs are non-resident *enemy* aliens.

It has been held that an alien friend is entitled to the protection of the Fifth Amendment, Russian Volunteer Fleet v. United States, 282 U.S. 481, 489, 51 S.Ct. 229, 75 L.Ed. 473 (1931), and to the Fourteenth Amendment, Kwong Hai Chew v. Colding, *supra.* His property cannot be taken without just compensation. I would conclude in this case that the alien does have property in this state, and proceed on that basis to analyze the statute.

This brings me to the third issue connected with this case, that is, whether the Nebraska statutory scheme provides for compensation to these aliens who would have been entitled to the land but for the operation of § 76–402. The majority opinion does not address itself to this issue, which could be the key to whether the statute conforms to the requirements of due process. If the statutory scheme provides for compensation, it is difficult to conceive how plaintiffs were denied any rights under the Fourteenth Amendment. If, on the other hand, these plaintiffs are not to be compensated, I conclude that the statute violates the due process clause.

As originally enacted the alien land law provided in pertinent part:

"Section 1. Non-resident aliens and corporations not incorporated under the laws of the state of Nebraska, are hereby prohibited from acquiring title to or taking or holding any lands or real estate in this state by descent, devise, purchase or otherwise, only as hereinafter provided, except that the widow and heirs of aliens who have heretofore acquired lands in this state under the laws thereof, may hold such lands by devise or descent for a period of ten (10) years and no longer, and if at the end of such time herein limited such lands so acquired have not been sold to a bona fide purchaser for value, or such alien heirs have not become residents of this state, such lands shall revert and escheat to the state of Nebraska, and it shall be the

duty of the county attorney in the counties where such lands are situated to enforce forfeitures of all such lands as provided by this act.

Sec. 2. Whenever any such lands shall revert and escheat to the state of Nebraska as provided in this act, it shall be the duty of the county attorney of the county in which such lands are situated to proceed against such alien in the district court of the county where the land is situated, for the purpose of having such forfeiture declared. Service of summons may be had upon the non-resident alien defendants by publication as provided in the Statutes of Nebraska for the service of summons by publication in cases of foreclosure of mortgages, and the court shall have power to hear and determine the questions presented in such cases and to declare such lands escheated to the state; and when such forfeiture shall be declared by the district court it shall be the duty of the clerk of the court to notify the governor of the state that the title to such lands is vested in the state by the decree of the said court, and the clerk of the court shall present the auditor of public accounts with the bill of costs incurred by the county in prosecuting such case, who shall issue a warrant to the clerk of the court on the state treasurer to repay the county for such costs incurred.

The heirs or persons who would have been entitled to such lands, shall be paid by the state of Nebraska the full value thereof, as ascertained by appraisement upon the oaths of the judge, treasurer and clerk of the county where such lands lie, and such lands shall then become subject to the law, and shall be disposed of as other lands belonging to the state; *Provided,* That the expense of the appraisement shall be deducted from the appraised value of the land." Laws 1889, c. 58, §§ 1–2, pp. 483–485.

It is readily apparent that the statute applied only to non-resident aliens, and pro-

vided for full compensation to *any person* "who would have been entitled to such lands." R.S.1913 shows that the original act was subdivided into specific statutory sections. Section 2 of the original act, covering the escheat and compensation provisions was amended *in* 1911, adding a second proviso not here relevant.

In Toop v. Ulysses Land Co., 237 U.S. 580, 35 S.Ct. 739, 59 L.Ed. 1127 (1915), the United States Supreme Court dismissed for want of jurisdiction a challenge to the statute in its original form. In doing so, the Court stated:

> "[The] contention that the state statute forbidding ownership of real property by aliens was repugnant to the Fourteenth Amendment, * * * we think also too frivolous to afford a basis for jurisdiction * * *." *Id.* at 582–583, 35 S.Ct. at 740.

In *Toop* it was clear, however, that the statutory scheme provided compensation to those heirs who would have been entitled to the land. It obviously could not be said, therefore, that the statute "deprive[d] any person of * * * [their] property without due process of law; * * * *"*

In 1921, Section 1 of the original act, R.S.1913 § 6273, was amended, *inter alia,* to eliminate the statutory distinction between resident and non-resident aliens. The newly amended statute, eliminating the term "non-resident" thus applied to all aliens. This amended statute appeared in Comp.Stat.1922 § 5687. Comp.Stat.1922 § 5688, providing for compensation to the heirs who would have been entitled to the lands, remained unchanged.

In Nelson v. Nielson, 113 Neb. 453, 203 N.W. 640 (1925), a naturalized United States citizen residing in Nebraska died, leaving a wife, daughter, and brother residing in this country. The state brought an *action to* quiet title to land owned by the decedent, asserting that

none of the relatives could take the land. In the course of its opinion, the court construed § 5688 relating to compensation and stated: "[I]f by our law the * * * [property] is ever escheated to the state it must be by appropriate proceedings *and upon full compensation." Id.* at 459, 203 N.W. at 642 (emphasis added). It was further clarified by the court that the alien was to be compensated even though he could not hold the property.

Comp.Stat.1922 § 5687 became 'Comp. Stat.1929 § 76–502. In 1939, the statute was amended by the legislature. When the statutes were revised in 1943, the Revisor of Statutes divided the amended § 76–502 into what is now §§ 76–402, 76–403, 76–404, 76–405, 76–406, 76–407, 76–412, 76–413, and 76–414. Comp.Stat. 1929 § 76–503 was inserted as § 76–408 in the 1943 Revision.

Before the 1943 revision, the statute provided in part:

"Whenever any such lands shall revert and escheat to the State of Nebraska, as provided in *this article,* it shall be the duty of the county attorney [to bring escheat proceedings in the county court.] * * * The heirs or persons who would have been entitled to *such lands* shall be paid by the State of Nebraska the full value thereof, * * *"

The Revisor eliminated the phrase "this article" and substituted "sections 76–403, 76–405 and 76–411." The Revisor's notes indicate that the phrase "this article has reference to the provisions of those sections providing that lands shall escheat to the State of Nebraska and has

been changed to 'sections 76–403, 76–405, and 76–411' for definiteness."

In Semrad v. Semrad, 170 Neb. 911, 104 N.W.2d 338 (1960), the Nebraska Supreme Court was confronted with an interpretation of this change in language by the Revisor. · In that case the deceased left land owned by him in Nebraska to a number of surviving heirs residing in Czechoslovakia. The ,State filed a petition of intervention, asserting a reversion of the land to the State. The petition was subsequently withdrawn. It was immediately re-filed. The district court ruled that the State had waived its right to an escheat by intervening and then withdrawing, but the State Supreme Court reversed and remanded the case to the district court. In the course of argument the appellees asserted that the Revisor had changed the meaning of the statute by replacing the words "this article" with specific section numbers of the statues. In response, the court stated:

"The meaning of the act was not changed. To hold otherwise would render section 76–401 * * * a meaningless provision. The acts governing escheats must be construed together and effect given to each provision if it is possible to do so. Section 76–408 * * * clearly refers to the exceptions and provisos of sections 76–403, 76–405, and 76–411 * * * and not to section 76–401 * * * which provides for the vesting of title in the state without legal action. In any event, the Legislature reenacted section 76–408 * * * in its present form when it adopted and included the questioned language in a general revision of the statutes." *Id.* at 917, 104 N.W. 2d at 342.[4]

4. A personal note must be here added. Perhaps it accounts for my feeling that I cannot adopt the majority opinion and thus bar the plaintiffs from their inheritance. Walter D. James, now deceased, was the Revisor of the 1943 statutes. He asked Paul Boslaugh, later a Justice of the Nebraska Supreme Court, and now deceased, and me, to serve without compensation as advisors to the Re-

visor. We did. Mr. James was Supreme Court Reporter when the *Semrad* opinion was filed and Volume 170 bears his name. The quoted statement that the meaning of the act was not changed is thus of great significance. It has not only the stamp of authority of Justice Boslaugh's concurrence and Mr. James' reporting but I too know that it was not intended in the revision to change the

It is to be noted that no reference is made to § 76–402 which is involved in this case along with § 76–401. The focal point in *Semrad*, however, is significantly different than in the instant case. There the question was whether proceedings in escheat under § 76–401 had to be instituted by the county attorney when there was a failure of heirs under § 76–402, or whether the escheat occurred automatically. The court did *not* state in its opinion whether compensation must be paid for the land which escheats to the state to those who would have been entitled to the land, save for the operation of § 76–402.

The court's decision in *Semrad* results in a paradox. If in fact the Revisor did not change the meaning of § 76–402 by substituting specific statutory sections for the phrase "this article", which is seemingly correct in light of the Revisor's notes, then clearly compensation must be paid, even though § 76–402 is not specified in § 76–408. If, on the other hand, the exceptions and provisos enumerated do not impliedly encompass § 76–402, and no compensation is to be paid, then the meaning of the former statute *was* changed by the Revisor's substitution. If no compensation is to be paid, the statute amounts to a pure and simple confiscation of the property. In this connection, it must be pointed out that there is no indication in *Semrad* that compensation is not to be paid. This issue was argued and briefed to the State Supreme Court in *Semrad*, but the court did not answer this question in the course of its opinion.[5]

I submit that the proper reading of the legislative history of the escheat provisions indicates that the intent was to provide compensation to those persons who would have been entitled to the land, and that the Revisor of Statutes did not intentionally alter this meaning in 1943. Concededly, the statute does not provide for compensation when land escheats under §§ 76–401, –402, and arguably by adopting the proposed change the legislature changed the requirement. If this is in fact true, then the statute here primarily under attack, § 76–402, constitutes a deprivation of property without compensation, one of the most elementary ingredients of due process, and is unconstitutional. It is more probable that the meaning of the statute was inadvertently changed in 1943, and that under the present scheme no compensation is to be paid. On that ground I would declare the statute invalid.

As indicated at the beginning of this opinion, I think the case now pending in the state courts should be continued and the Nebraska Supreme Court afforded the opportunity of interpreting the Nebraska statutes. I would withhold final disposition of this case awaiting such decision.

For the reasons given I cannot agree with the majority opinion in denying these non-resident aliens, with whose country the United States is not at war, the property or compensation therefor, which their American citizen relative desired them to have.

law as it then existed, and bar non-resident aliens from compensation even though § 76–402 is not specified in § 76–408. The Revisors, and I include myself in the term, erred in their enumeration of exceptions and provisos. Therefore, I cannot stand by without protest and let

plaintiffs' inheritance be taken away without compensation.

5. It is upon this basis that I feel the abstention doctrine should be applied in this case.